IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

OZBURN-HESSEY LOGISTICS, LLC  :  **FILED**  CIVIL ACTION
                             :
v.                           :  APR – 7 2014
                             :
721 LOGISTICS, LLC, *et al.*     MICHAEL E. KUNZ, Clerk  No. 12-0864
                             By_____Dep. Clerk

## MEMORANDUM

**Restrepo, J.**                                                **April 4, 2014**

Ozburn-Hessey Logistics, LLC ("OHL"), brings this suit against a new competitor in the

customs brokerage industry, 721 Logistics, LLC (d/b/a J&K Fresh East) ("721"), and the

individuals and corporate entities involved in its launch. Most centrally, OHL accuses the

defendants of sabotage. According to its allegations, the defendants participated in a coordinated

plan to cripple OHL's produce-clearing operations and convert its customers by arranging for

OHL's entire perishables division to quit, and join 721, at precisely the moment when it would

be most damaging to OHL. The defendants contend that they have engaged in nothing more

than legitimate commercial competition. They have filed two motions for summary judgment,

which I will address jointly. For the reasons that follow, the motions will be granted in part and

denied in part.

### I.  BACKGROUND

OHL is an international logistics company "in the business of providing global supply

chain management solutions." Am. Compl. at ¶ 1. Its business "includes customs brokerage,

ecommerce fulfillment, freight forwarding, network design and consulting, warehouse

management, supply chain management technology and related services." *Id.* OHL currently

employs thousands of people worldwide and approximately 139 in Philadelphia. Dep. of OHL corporate designee Brian Patrick Riley ("OHL Dep.") 15.

Lawrence ("Larry") Antonucci served as President of OHL's Global Freight Management and Logistics Division for the Americas from 2006 to 2009. Am. Compl. ¶ 16; Answer (Doc. 14) ¶ 4; OHL Dep. 59; Dep. of L. Antonucci ("L.A. Dep.") 29-33. His employment agreement contained a one-year non-compete provision, which expired on December 31, 2010, and a two-year non-solicitation provision, which expired on December 31, 2011. Doc. 14-1. In January of 2011, Larry contacted Lynette Keffer to explore the possibility of starting a new business together. L.A. Dep. 51-52. Lynette is the sole owner and principal of J&K Fresh, LLC ("J&K"), a California customs brokerage firm with a focus on perishables. Dep. of L. Keffer ("L.K. Dep.") 7, 13-18. Until that point, J&K had operated on the West Coast exclusively. *Id.* 18.

Larry and Lynette[1] decided to arrange an in-person meeting, and on February 4, 2011 Larry came to J&K's California offices. L.A. Dep. 68-69; L.K. Dep. 36-38; Ex. 10, Doc. 82. He brought his cousin, John Ercolani, then employed by OHL as Assistant Manager of Operations. *Id.* Raymond Keffer, Lynette's son and the Vice President of Operations at J&K, also attended. At the meeting, Lynette and Larry discussed the possibility of a joint venture, which would have required Lynette to buy out her then-partner and operate an East Coast office. L.K. Dep. 69-71. Larry suggested that he might loan her the money to make it possible. *Id.* The parties dispute the extent to which Raymond and Ercolani participated in the substantive business discussion.

In the weeks after, Larry and Lynette corresponded about the "deal" discussed. Ex. 11, Doc. 84. The original plan did not come to fruition. L.K. Dep. 44. Instead, the two eventually arrived at another arrangement: J&K would license its brand to 721, which would remain an

---

[1] I intend no disrespect, but will use first names as the most natural means of differentiating between Larry and John Antonucci and between Lynette and Raymond Keffer.

independent enterprise but do business as "J&K Fresh East" ("JKE"). L.K. Dep. 75-76, 103-07.

In October of 2011, Lynette and Larry signed a Licensing, Collaboration and Alliance

Agreement ("Licensing Agreement"), which licensed the J&K brand to 721 in return for a share

of profits. Ex. 13, Doc. 85. It also granted each party a right of first refusal in the event that the

other wished to sell a portion of its business. *Id.* § VI. The right was subject to exceptions: J&K

could sell to Raymond or Robert Lee Hoy, and 721 could sell to Ercolani or John Antonucci –

Larry's brother, then a Vice President of Global Account Management at OHL – without

triggering the provision. *Id.* & Ex. A.

During the remainder of 2011, Lynette and Larry corresponded at length about the JKE

launch, set for January 2012, and the hiring of employees. *See* Ex. 31, Doc. 84; Ex. 23, Doc. 84;

Ex. 44, Doc. 84. Lynette "knew [that Larry] was going to make job offers to people he knew in

the industry with experience," and "could assume" they would be OHL employees, but aside

from Ercolani and John Antonucci she did not know who they would be. *Id.* 31, 78, 88, 93-98.

Larry informed her that he expected "to have the core team members give two weeks' notice to

their current employer on January 3." Ex. 22, Doc. 85.

On January 1, 2012, Larry contacted nine OHL employees and invited them to attend an

open house at 721 the following day. Two of the employees were John Ercolani and John

Antonucci. The other seven were non-management employees in OHL's produce division:

William Fagan, Helena Mateus-Martins, Michael McLaughlin, Maura Miceli, Evan Moss,

Antoinette Pannell, and Barbara Zimmerman (hereinafter "the former OHL perishables

employees" or "721 employees"). All of the group, save Moss, came to the meeting, where

Larry offered them each employment with 721. As a condition of employment, Larry required

that each person resign on January 6, using a form letter that he had drafted. He made the same

3

offer to Moss by phone on January 3.  *See* L.A. Dep. 140-52; Fagan Dep. 57; McLaughlin Dep. 27-29, Ercolani Dep. 90-92, J. Antonucci Dep. 11, Moss Dep. 77-83, 86-87, 93; Ex. 30, Doc. 84; Ex. 59, Doc. 85.

All nine OHL employees accepted.  The group submitted their resignations on January 6. OHL Dep. 45-46, 119-121.  They had all been employed at will.  *Id.* 37, 46-47.  Moss, Ercolani and John Antonucci had signed limited contracts with OHL; the others had not.  *See* Exs. 39-41, Doc. 85.

The departing employees complied with OHL's notice requirements and worked diligently during the remainder of their tenure there.  OHL Dep. 38-39, 47, 49, 206-07; Ercolani Dep. 181-84; Moss Dep. 137-38; Fagan Dep. 76-77.  Nonetheless, the loss of the team was a profound blow to OHL.  Although the senior leadership and administrative staff of the Philadelphia perishables division remained intact, the employees who left to join 721 were the only ones who had been in regular contact with OHL's perishables clients.  OHL Dep. 64, 90-91, 142; Ercolani Dep. 167; OHL Aff., Ex. 63, Doc. 85, ¶¶ 3-5.  As a result of the group resignation, OHL could not "effectively and efficiently clear produce shipments" for several months.  OHL Aff. ¶ 6; *see also* Ex. 46, Doc. 84 (email from Raymond to Larry and Ercolani reporting that "OHL is paying demurrage for Naturipe/Hortifruit.").  This allegedly caused OHL to lose clients and millions of dollars in revenues.  *See* Ex. 49, Doc. 85.

On February 17, 2012, OHL filed suit against 721, J&K, Larry Antonucci and Evan Moss.  OHL's Amended Complaint, filed September 9, 2012, added ten individual defendants: John Antonucci, John Ercolani, Lynette and Raymond Keffer, and the 721 employees.  The Amended Complaint contains six substantive claims: (1) misappropriation of trade secrets in violation of the Pennsylvania Uniform Trade Secret Act, against all defendants; (2) unfair

4

competition, against all defendants; (3) breach of contract, against Moss and Ercolani; (4)

tortious interference with contractual relations, against 721, J&K, Larry, Ercolani, and the

Keffers; (5) civil conspiracy, against the same group; and (6) breach of the duty of loyalty,

against the 721 employees.

By two separate motions, the defendants now move for summary judgment in their favor.

## II.   JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 28 U.S.C. § 1332, and Pennsylvania law applies.

*See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-80 (1938).  Where the law is unclear and there is

no controlling decision by the Pennsylvania Supreme Court, this Court must "predict" how it

would rule, giving "due regard, but not conclusive effect, to the decisional law of lower state

courts." *Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000).

In ruling on a motion for summary judgment, a court must "construe the evidence in the

light most favorable" to the non-moving party, *Zimmerman v. Norfolk S. Corp.*, 706 F.3d 170,

176 (3d Cir. 2013), and grant summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).  "A 'genuine dispute' exists if a reasonable jury could find for the nonmoving

party." *Zimmerman*, 706 F.3d at 176.  Once the moving party has carried its burden, the non-

moving party "must do more than simply show that there is some metaphysical doubt as to the

material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986).  It must, instead, identify evidence sufficient to support a verdict in its favor. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); C. Wright, A. Miller, & M. Kane,

10B Fed. Prac. & Proc. Civ. § 2734 (3d ed.).  "Rule 56(c) mandates the entry of summary

judgment . . . against a party who fails to make a showing sufficient to establish the existence of

5

an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.   DISCUSSION

### A.   Count II:[2] Misappropriation of Trade Secrets (All Defendants)

OHL alleges that all of the defendants have misappropriated its trade secrets in violation of the Pennsylvania Uniform Trade Secret Act, 12 Pa. C.S.A. § 5301 *et seq.* ("PUTSA"). As OHL clarified at oral argument, there is only one alleged trade secret at issue:  the client contact information in the "customer pipeline" spreadsheet developed at 721 in January of 2012. *See* Ex. 14, Doc. 82; Ex. 20, Doc. 85.

#### 1.   The "Customer Pipeline" Spreadsheet

The history of this document is a matter of controversy.  It is undisputed that, sometime shortly after the JKE launch, Larry Antonucci created a spreadsheet listing produce importers that he had identified as potential JKE clients, along with contact information, to guide JKE's solicitation efforts.  Ex. 20, Doc. 85; L.A. Dep. 162-64; Moss Dep. 108.  It appears undisputed that the Keffers had forwarded contact information for existing J&K clients who had expressed interest in JKE, which Larry incorporated into the chart.  *See* L.A. Dep. 162-64; R. Keffer Dep. 135.  Finally, it is undisputed that Larry emailed the spreadsheet to Raymond Keffer on February 1, 2012, asking him to mark the companies that were current clients of J&K.  Tr. 82-84; Ex. 20, Doc. 85.  Raymond did, and returned the updated chart three hours later.  *Id.*  The version that he returned is included in the record and is the subject of OHL's misappropriation claim.

The matter in dispute is the origin of the other contact information included in the spreadsheet.  According to OHL, the spreadsheet contained "precise names and contact

---

[2] Count I, which requests injunctive relief, is not a substantive cause of action and so will not be addressed at this juncture. *See* Am. Compl. ¶¶ 62-66.

6

information for seventy-two (72) OHL customers, forty eight (48) of which were identified as non J&K Fresh customers." OHL Resp. at 24. The contact information listed was "the exact customer contact information" that OHL had "developed and used for its clients." OHL Aff., Ex. 63, Doc. 85 at ¶ 7. OHL alleges that the 721 employees provided this information. More precisely, OHL contends that these contacts were developed by the 721 employees during their tenure at OHL and then supplied to JKE during meetings in the last week of January 2012. Tr. 64, 103, 110; Ex. 20, Doc. 85. Despite conflicting testimony in the record, OHL contends that the individual names, email addresses and phone numbers are not publicly available, such that the employees who attended the meetings must have been their source. Tr. 64.[3] OHL further contends that the compilation qualifies as a customer list subject to PUTSA protection. The alleged secret is not the spreadsheet itself, nor the identities of the customers, but rather the individual contacts for those clients that were unique to OHL. *See* OHL Resp. 28 n.5; Tr. 57-59.

## 2. The PUTSA

Pursuant to the PUTSA, "misappropriation" includes the acquisition, disclosure or use of a trade secret by a person who knows or has reason to know that it was acquired through improper means. 12 Pa. C.S.A. § 5302.[4] The PUTSA defines a trade secret as

---

[3] Larry Antonucci testified that he himself developed the contact information through public sources and phone calls, and the only employee questioned on this point believed that the contacts were already in the chart when it was handed out during the bi-weekly meetings. L.A. Dep. 162-64; Fagan Dep. 62-69.

[4] In full, the PUTSA defines misappropriation as:

(1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) disclosure or use of a trade secret of another without express or implied consent by a person who:
   i. used improper means to acquire knowledge of the trade secret;
   ii. at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

[i]nformation, including a . . . compilation including a customer list, . . . that [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons . . . [and is] the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* In determining whether information is protected as a trade secret, Pennsylvania courts

consider:

the extent to which the information is known outside of the company's business; (2) the extent to which the information is known by employees and others involved in the company's business; (3) the extent of the measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money the company spent in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated legitimately by others.

*Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010) (citing *Crum v.*

*Bridgestone/Firestone N. Am., LLC*, 907 A.2d 578, 585 (Pa. Super. Ct. 2006).[5]

Although customer lists can constitute trade secrets for purposes of the PUTSA, customer

data "is at the very periphery of the law of unfair competition." *Iron Age Corp. v. Dvorak*, 880

A.2d 657, 663 (Pa. Super. Ct. 2005). The Pennsylvania Supreme Court has held that, in

businesses where "permanent and exclusive relationships are established between customers and

salesmen," "[t]he customer lists and customer information which have been compiled by such

---

    A. derived from or through a person who had utilized improper means to acquire it;

    B. acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

    C. derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

    iii. before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Pa. C.S.A. § 5302.

[5] The PUTSA has displaced Pennsylvania's common law tort for misappropriation of trade secrets, but has essentially retained its definition of trade secret. *See Youtie v. Macy's Retail Holding*, 626 F. Supp. 2d 511, 522 n.10 (E.D. Pa. 2009). Pre-PUTSA case law thus remains relevant. *Cf. Brett Senior & Assoc. v. Fitzgerald*, No. 06-1412, 2007 WL 2043377, at *7-8 (E.D. Pa. 2007) (relying on pre-PUTSA cases).

firms represent a material investment of employers' time and money," are "highly confidential," and qualify as a trade secret subject to protection. *Morgan's Home Equip. Corp. v. Martucci*, 136 A.2d 838, 842 (Pa. 1957). Customer lists are not protected, however, when they are "available through published lists of suppliers and other catalogue and sales publications." *Id.* at 842 n.2 (citing *Vincent Horwitz Co. v. Cooper*, 41 A.2d 870 (Pa. 1945)); *see also, e.g.*, *Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy*, 203 A.2d 469, 473 (Pa. 1964) ("Equity will not protect mere names and addresses easily ascertainable by observation or reference to directories."). Moreover, "the Third Circuit has expressly held that an employee's personal business contacts, although made while in plaintiff's employ, are not plaintiff's trade secrets." *BIEC Int'l, Inc. v. Global Steel Servs., Ltd.*, 791 F. Supp. 489, 546 (E.D. Pa. 1992) (citing *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1258 (3d Cir. 1985)).

Finally, because "[t]he concept of a trade secret is at best a nebulous one," *PNC Mortg. v. Superior Mortg. Corp.*, No. 09-5084, 2012 WL 628000 (E.D. Pa. 2012) (quoting *Van Prods. Co. v. Gen. Welding & Fabricating Co.*, 213 A.2d 769, 775 (Pa. 1965)), many courts have opined that "[t]he question of whether certain information constitutes a trade secret is a question of fact to be resolved by the jury or the trier of fact." *Camelot Tech., Inc. v. RadioShack Corp.*, No. 01-4719, 2003 WL 403125 (E.D. Pa. 2003); *see also Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 410 (E.D. Pa. 2009) ("[D]etermining whether information constitutes a trade secret is generally left to the jury."); *PNC Mortgage*, 2012 WL 628000, at *22. With these principles in mind, I turn to the facts of this case.

        3. *Analysis*

            a) Existence of a Trade Secret

OHL's primary allegation, as presented in briefing and in oral argument, is not that each

contact in the spreadsheet qualified as a trade secret. OHL argues, rather, that the *compiled*

information is subject to protection. *See* Tr. 58-59; OHL Resp. 19-22. The obvious hurdle here

is that OHL did not create the compilation—721 did. The rationale for protecting compilations

as trade secrets is that the act of compiling entails the investment of time and resources; it is that

investment the law seeks to protect. *See, e.g., Morgan's Home Equip. Corp.*, 136 A.2d at 841-

42; *Amerisourcebergen Drug Corp. v. Am. Associated Druggists, Inc.*, No. 05-5927, 2008 WL

248933, at *25-26 (E.D. Pa. 2008); *Youtie v. Macy's Retail Holding, Inc.*, 653 F. Supp. 2d 612,

621 (E.D. Pa. 2009). That rationale is plainly inapplicable to OHL's claim.

To put it more bluntly, OHL cannot claim trade-secret protection for a customer list

produced by someone else. It cannot accuse the defendants of "misappropriating" a list that they

themselves created. If OHL claimed that the 721 spreadsheet was merely a reproduction of a list

that already existed at OHL, the situation would be different. But OHL has not made that

argument, and the record contains no evidence to support it. Rather, OHL argues that the

compilation is its trade secret because the information it contains was previously possessed by

OHL employees under a duty of confidentiality. *See, e.g.,* Tr. 108-110. The claim tends to the

metaphysical; it seeks protection for a compilation that allegedly existed in the collective mind of

its employees before they joined 721 and committed it to paper.

There is no basis in Pennsylvania law for affording OHL trade-secret protection for a

customer list that it never possessed. The only argument available to OHL is that the customer

contacts *themselves* qualify as trade secrets, either individually or in combination. It is a dubious

claim, given the Third Circuit's holding in *SI Handling Systems, Inc.* that key contacts at client

companies were not protectable as trade secrets. *See* 753 F.2d at 1258-59 ("SI did not require

10

such covenants [not to compete] from its employees, and cannot now through the medium of trade secrets law prevent them from exploiting their GM contacts.") (applying Pennsylvania law). On the other hand, *SI* involved determinations of fact – including the fact that the contact information at issue was publicly available – and it does not necessarily foreclose OHL's claim as a matter of law. I will therefore leave the question of whether the customer contact information was OHL's trade secret for trial.

### b) Misappropriation

If some of the customer contact information included in the 721 spreadsheet qualifies as OHL's trade secret, a reasonable jury could conclude that 721, Larry Antonucci and John Ercolani misappropriated its trade secrets. As to the remaining defendants, however, OHL has not identified evidence sufficient to support the claim.

OHL's allegation against the 721 employees (Fagan, Moss, McLaughlin, Mateus-Martins, Miceli, Pannell and Zimmerman) is that they disclosed OHL's trade secrets. *See* OHL Resp. 27. OHL has not specified what contact information each of these defendants supposedly disclosed. Nor has it adduced evidence to support individualized allegations. There is no evidence that could support a finding, for example, that Antoinette Pannell disclosed any specific contact information. The same is true for the other employees. In fact, according to the testimony on which OHL relies, Moss, Miceli and Zimmerman did not attend the relevant meetings at all. *See* Fagan Dep. 64.

OHL cannot make out the elements of its PUTSA claims against individual defendants on the basis of vague group allegations. It has chosen to accuse each employee of violating the law, and must support each claim with evidence. It has failed to do so: OHL has identified no

11

evidence in the record that could justify a finding that any one of these workers, as an individual, disclosed OHL's trade secrets.

As for John Antonucci, he did not join 721 until April of 2012. J. Antonucci Dep. 22, 45. OHL does not allege that he participated in the January meetings that supposedly produced the spreadsheet. Nor has OHL shown that he personally acquired or used the compilation, knowing that it was obtained through improper means. The evidence itself does not suggest that he did. *See* L.A. Dep. 224. Because it has not made or supported any specific allegations against Antonucci on this count, OHL has not discharged its burden to demonstrate a genuine dispute of material fact.

Finally, OHL's claim against J&K and the Keffers – that they acquired and used the contact information in the spreadsheet – is not supported by the record. The relevant evidence establishes that Raymond received the spreadsheet from Larry, entered a "Y" in the rows containing the names of existing J&K clients, and returned the spreadsheet the same day. Ex. 20, Doc. 85. As OHL concedes, there is no evidence that he, or anyone else at J&K, downloaded the spreadsheet, saved the spreadsheet, or ever looked at it again. Tr. 82-84. OHL's argument is, rather, that Raymond's unsolicited receipt of the spreadsheet "creates an inference that J&K Fresh Defendants used the spreadsheet, and therefore used Plaintiff's trade secrets, to solicit clients. . . ." OHL Resp., Doc. 84 at 16. That is not a reasonable inference; it is unmoored speculation. No reasonable fact-finder could conclude that Raymond's review and return of the spreadsheet demonstrates that J&K acquired or used the forty-eight unique OHL contacts to solicit new clients.

OHL makes a range of other arguments with respect to J&K and the Keffers, none of which are persuasive. It argues that an email from Lynette to Larry in March 2012, which

12

suggested public sources for client contact information, "is direct evidence that Mrs. Keffer knew that Mr. Antonucci had to manufacture a cover-up." Resp. 16 (citing Ex. 62, Doc. 84). Even if this were true, it would not be evidence that J&K or the Keffers used the client contacts themselves. Secondly, OHL argues that J&K and the Keffers "used" the spreadsheet's content because they profited by it, via the licensing agreement, or, in another formulation, that they used the information along with 721, "as a group." Tr. at 85. As a legal matter, however, these defendants are not "a group." They are separate entities. OHL has not alleged vicarious liability or any other legal basis on which the Keffers and J&K should be deemed responsible for the actions of 721.

I will accordingly grant summary judgment in favor of J&K, Lynette Keffer, Raymond Keffer, John Antonucci, and the 721 employees on Count II. OHL's PUTSA claim against 721, Larry Antonucci and Ercolani may proceed to trial.

### B. Count III: Unfair Competition (All Defendants)

Count III of OHL's Amended Complaint alleges that all of the defendants engaged in unfair competition. As defined in Pennsylvania common law, unfair competition is the "[s]ystematic inducing of employees to leave their present employment and take work with another" in order "to cripple and destroy an integral part of a [business]," or "for the purpose of having the employees commit wrongs, such as disclosing their former employer's trade secrets or enticing away his customers," rather than "to obtain the services of particularly gifted or skilled employees." *Albee Homes, Inc. v. Caddie Homes, Inc.*, 207 A.2d 768, 771 (Pa. 1965); *see also Reading Radio, Inc. v. Fink et al.*, 833 A.2d 199, 212 (Pa. Super. Ct. 2003).

OHL's claim on this count is that the defendants planned and executed "an *en masse* resignation for the purpose of crippling OHL's perishable division and converting OHL clients

and business." Resp. at 15. OHL argues that the group resignation was timed in order to cause

OHL maximal harm, and that the customer pipeline, which targeted OHL clients, illustrates the

plan: "Their entire business model was premised on the notion that when they took away the

perishable division that created a window where OHL would be incapable of servicing its

customers." Tr. at 73. OHL further claims that 721 hired its perishables team in order to induce

the employees to disclose confidential client information and entice away OHL's customers. *See*

Resp. 28.

  In support of its claim, OHL cites a number of emails between Lynette and Larry during

2011. Construed in the light most favorable to OHL, they show that Lynette and Larry

intentionally kept their early interactions secret, *see* Exs. 10, 17, 51, Doc. 85; that they planned to

work with John Ercolani from the start, *see* Exs. 10 & 19, Doc. 84; Ex. 61, Doc. 85; that Larry

planned to recruit OHL employees, *see* Ex. 23, Doc. 84; and that he anticipated a hostile reaction

from OHL, *see* Ex. 44, Doc. 84. On December 29, 2011, corresponding with Lynette about a

possible visit, Larry wrote:

> I think early to mid-Feb might work better. January is going to be hectic –
> employees don't come on board until Jan 23, then we have to get them enrolled
> for payroll and benefits, train them on GMS, etc., etc. After the first week of
> January – when all the 's' will hit the fan and we'll have a much better picture of
> what we're up against – we'll set a date!

*Id.*

  OHL also invokes a series of emails authored by Larry and the Keffers in January of

2012 as *ex post* evidence of their intent to "cripple" OHL. They include:

- An email from Lynette to Larry regarding the reactions of J&K clients to the JKE launch:
  "We have phoned some clients. They are excited and happy for us. The only concern, as
  we knew it would be, is the timing. Some will come immediately; others will wait until
  there are problems with their clearances." Ex. 21, Doc. 84 (Jan. 20, 2012).

14

- An email from Raymond to a client, in response to the client's statement that JKE had "snagged some good ones from Barthco:" "Ha ha ha the whole perishable team! They're waiting for your business Clay!" Ex. 15, Doc. 84 (Jan. 23, 2012).

- Raymond's email to Larry when he returned the "customer pipeline" spreadsheet: "How's this for quickness? . . . Snappin' necks and cashin' checks! Let's go!" Ex. 20, Doc. 85 (Feb. 1, 2012).

- An email from Larry to Lynette regarding client solicitation: "Met with LGS and Kopke today . . . no commitals but we will see what happens when the ball gets drop [sic] on them as well." Ex. 45, Doc. 85 (Jan. 31, 2012).

- An email from Lynette to Larry regarding JKE's prospects: "I do think the winds are blowing our way! I think as soon as JKE clears a few, the word will spread that if you want the job done right, go with JKE. I think that is going to be sooner rather than later from what I am hearing." *Id.*

Construing this evidence, and the record as a whole, in the light most favorable to OHL, a fact-finder could potentially conclude that the launch of 721 was timed to cause catastrophe for OHL, and that its business plan was premised on exploiting OHL's plight rather than on providing superior service. The claim is a tenuous one; there is no dispute that the employees recruited by JKE were skilled and gifted, *see, e.g.*, L.A. Dep. 140, and the JKE launch also coincided with the expiration of Larry's non-compete agreement. Nevertheless, the motive for the coordinated January 6 resignation is a disputed material fact. Because Larry did systematically induce OHL employees to resign and join JKE, and because his motive is in dispute, summary judgment is inappropriate as to him and 721.

As to the other defendants, however, there is no evidence in the record that any of them recruited the OHL employees, systematically or otherwise. OHL contends that the Keffers knew what Larry was planning ahead of time and endorsed the plan. *See* Resp. 30. If true, that supports the claim of conspiracy. It does not show that the Keffers themselves did any recruiting. Nor does the fact that many of the employees cited the J&K brand as an inducement to join JKE. Ex. 8, Doc. 84, 24; Ex. 3, Doc. 84, 37; Ex. 6, Doc. 84, 155.

15

Finally, OHL alleges that the individual employees were systematically induced to leave

OHL, not that they did any systematic inducing.  Even accepting OHL's allegation that they

"coordinated their resignations" and "encouraged each other," Resp. at p. 34; Tr. at 129, this

does not make out the elements of the claim.  The record is devoid of evidence that Mateus-

Martins, for example, systematically induced other employees to leave OHL.  The same is true of

John Antonucci, Ercolani, Fagan, McLaughlin, Miceli, Moss, Pannell and Zimmerman.  I will

accordingly grant summary judgment on Count III in favor of all defendants except Larry

Antonucci and 721.

### C.  Count IV: Breach of Contract (Moss & Ercolani only)

To prove a breach of contract a plaintiff must prove "the existence of a contract

(including its essential terms), a breach of duty imposed by the contract and resultant damages."

*Gen. State Auth. v. Coleman Cable & Wire Co.*, 365 A.2d 1347, 1349 (Pa. Cmwlth. 1976).  It is

undisputed that Moss signed a non-solicitation agreement with OHL that prohibited him from

soliciting any OHL client for three years following his departure.  Ex. 40, Doc. 85.[6]  It is also

undisputed that Ercolani signed an agreement stipulating that he would not "solicit for

employment, otherwise attempt to hire, assist in the hiring of, or employ" any OHL employee for

two years after his departure.  Ex. 39, Doc. 85; Tab-HH, Doc. 83-2; Ercolani Dep. 46.  As

clarified at oral argument, OHL's breach of contract claims are (1) that Moss breached his non-

solicitation contract by soliciting OHL customers, and (2) that Ercolani breached his non-

compete contract by employing OHL's former perishables employees.

There is no evidence in the record that Moss solicited any OHL client after his departure.

OHL initially alleged that he solicited C.M. Goettsche, but the evidence establishes that it was

---

[6] Moss' contract includes a choice-of-law provision electing "the law of the U.S. District Court for the
Middle District of Tennessee, Nashville Division" to govern its construction, *id.* § 6, but the parties have
mutually waived application of this section.

16

John Ercolani who obtained the account. *See* OHL Dep. 43-44, 53-58; Ex.-Moss 17 (Tab AA,

Doc. 83-2); Moss Dep. 113-18.  OHL does not now dispute that fact.  That Moss subsequently

"had contact with and serviced" the C.M. Goettsche account, Resp. at 37, does not constitute

solicitation.  Likewise, the evidence that Moss was assigned to the prospective accounts of

former OHL clients on the customer pipeline spreadsheet does not show that he solicited those

clients.  Ex. 20, Doc. 85; Moss Dep. 113-18; L.A. Dep. 218 (stating that Moss "has no role

whatsoever in soliciting OHL clients" at JKE).  On this record, no reasonable fact-finder could

conclude that Moss breached his contract with OHL.  I will therefore grant summary judgment in

his favor.

The evidence is less clear with respect to Ercolani.  Ercolani became a partner and part-

owner of 721 Logistics in April or May of 2012.  Ercolani Dep. 80-85.  Construing the evidence

most favorably to OHL, there is a genuine dispute of material fact as to whether he "employed"

OHL employees in violation of his OHL covenant.  The breach-of-contract claim against

Ercolani may proceed to trial.

### D. Count V: Tortious Interference with Contractual Relations (721, J&K, Keffers, L. Antonucci & Ercolani)

To prevail on a claim for tortious interference with contractual relations in Pennsylvania,

a plaintiff must show

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;
> (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;
> (3) the absence of privilege or justification on the part of the defendant; and
> (4) the occasioning of actual legal damage as a result of the defendant's conduct.

*CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 384 (3d Cir. 2004)

(citing *Crivelli v. General Motors Corp.*, 215 F.3d 386, 394 (3d Cir. 2000) and *Pawlowski v.*

17

*Smorto*, 588 A.2d 36, 39-40 (Pa. Super. Ct. 1991)).[7] Pursuant to the Restatement (Second) of Torts, which Pennsylvania has adopted, the plaintiff must also show that the interference was "improper." *Crivelli*, 215 F.3d at 394-95; *see also* Rest. (Second) Torts § 767 (enumerating factors for courts to consider to determine whether conduct was improper, including the actor's conduct, motive, and interests).

OHL's claim on this count is that 721, J&K, Larry Antonucci, the Keffers and Ercolani induced Moss, John Antonucci and Ercolani "to breach their covenants with OHL." Am. Compl. ¶ 91. As discussed above, the record does not support a finding that Moss breached his contract with OHL. There is neither allegation nor proof that John Antoucci breached his contract with OHL. Because it cannot show a breach in either case, OHL cannot show "actual legal damage" as a result of the alleged interference.

With respect to Ercolani's contract, any claim against Ercolani himself is nonsensical. As to the other defendants, OHL has presented no evidence that they acted with the specific intent to damage his covenant with OHL. *See CGB Occupational Therapy, Inc.*, 357 F.3d at 384. The evidence might lead a reasonable jury to conclude that they intended for Ercolani to employ former OHL employees, which entailed a breach of his covenant, but nothing in the record suggests that they induced this action *in order* to cause the breach.

Given that the evidence cannot establish a breach of Moss or Antonucci's contract or that the defendants "specifically intended to harm the existing relation" established between Ercolani and OHL by his non-compete covenant, *id.*, OHL has failed to "make a showing sufficient to

---

[7] The defendants assert the "business competitor's privilege," which is codified by § 768 of the Restatement, but Pennsylvania courts have found § 768 not to apply when the business competitor is a former employee of the plaintiff. *See Assembly Tech. Inc. v. Samsung Techwin Co., Ltd.*, 695 F. Supp. 2d 168, 175 (E.D. Pa. 2010) (discussing this issue).

establish the existence" of elements essential to its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). I will accordingly grant summary judgment in favor of the defendants on Count V.

### E.  Count VI: Civil Conspiracy (721, J&K, Keffers, L. Antonucci & Ercolani)

"To prove a civil conspiracy, it must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979). "Proof of malice, i. e., an intent to injure, is essential in proof of a conspiracy." *Id.*  Furthermore, "[i]t must be shown that the *sole* purpose of the conspiracy was to injure the plaintiffs.  This necessary proposition is negated by a showing that the acts alleged were done for professional or business benefit." *Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 419 (E.D. Pa. 2009) (internal quotation marks and citations omitted).  Finally, a plaintiff must show that "some overt act" was committed "in pursuance of the common purpose or design," and that it resulted in actual legal damage. *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 212 (Pa. Super. Ct. 2003).  The claim "may be proven circumstantially by subsequent acts of the alleged conspirators, provided that the evidence is full, clear and satisfactory." *Id.*

Construing the evidence in the light most favorable to OHL, a fact-finder could potentially conclude that the defendants agreed to lift out OHL's perishables division at the precise time that it would damage OHL the most, in order to capitalize on OHL's resulting staff shortfall and convert its customers.  That conclusion depends, of course, on a finding that Larry Antonucci or 721 engaged in unfair competition.  At this stage, there are genuine disputes of material fact, and summary judgment will be denied.

### F.  Count VII:  Breach of the Duty of Loyalty (J. Antonucci, Fagan, Mateus-Martins, McLaughlin, Miceli, Pannel, and Zimmerman and Miceli)

19

The duty of loyalty requires that an agent "act with the utmost good faith in the furtherance and advancement of the interests of his principal." *Sylvester v. Beck*, 178 A.2d 755, 757 (Pa. 1962); *see also* Restatement (Third) of Agency § 8.01 (2006) ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."). The duty of loyalty does not, however, preclude an employee from seeking other employment. As one court in this district has explained,

> Pennsylvania law permits an agent or employee to "make arrangements to compete" [prior to the termination of his employment], but prohibits him from using "confidential information peculiar to his employer's business and acquired therein." . . . . [A]n employee who, while still working for her employer, makes improper use of her employer's trade secrets or confidential information, usurps a business opportunity from the employer, or, in preparing to work for a rival business, solicits customers for such rival business, may be liable for a breach of the duty of loyalty.

*Bro-Tech Corp.*, 651 F. Supp. 2d at 414 (quoting and citing *Spring Steels, Inc. v. Molloy*, 162 A.2d 370, 375 (Pa. 1960); citing *Cornerstone Sys., Inc. v. Knichel Logistics, L.P.*, 255 F. App'x 660, 663 (3d Cir. 2007)).

In briefing, OHL has argued that the individual employees breached the duty of loyalty by (1) meeting with Larry to discuss the mass resignation, knowing that it "would cripple OHL's ability to service its clients and clear shipments;" (2) "contact[ing] Moss and instruct[ing] him to speak with Larry Antonucci" about JKE; (3) refusing to identify their new employer in violation of the OHL code of conduct; and (4) after leaving OHL, divulging confidential client contact information and using it to solicit OHL customers. Resp. 47. These facts do not, independently or together, constitute a breach of the duty of loyalty. The employees were entitled to make arrangements to leave OHL and compete, notwithstanding the potential loss to OHL. Miceli did not breach any duty in relaying a message from Larry to Moss. *See* Moss Dep. 78. The duty of

20

loyalty did not require OHL's employees to identify their new employer. Finally, there is no allegation that any employee divulged confidential information while still employed at OHL.

At oral argument, plaintiff's counsel stated the claim more broadly, explaining the alleged breach as "the decision of the group collectively, consciously, to cripple Ozburn-Hessey, to agree to a business proposition that was intended to cripple Ozburn-Hesey." Tr. at 116.  OHL contends that "they all knew" about the alleged scheme before meeting with Larry on January 2, and "[t]o a person they bought into this unlawful scheme." Tr. at 113.  OHL's reasoning is that all nine employees could not possibly have accepted the offer to work with a fledgling company so quickly if they had not planned the mass resignation in advance.

Giving OHL the benefit of every reasonable inference, OHL's position lacks any support in the record. Larry testified that he did not solicit any employee before January 1, 2012. L.A. Dep., Ex. 5, Doc. 83, 141-42. Every single employee testified that he or she heard the offer for the first time in January 2012, at or just before the meeting with Larry.  J. Antonucci Dep. 35-38; Fagan Dep. 30; Mateus-Martins Dep. 19; McLaughlin Dep. 27; Miceli Aff.; Moss Dep. 76-77; Pannell Aff.; Zimmerman Aff.; *see also* J. Antonucci Interrogs., Ex. VV, Doc. 83, 4. All of those deposed testified that they were unhappy at OHL – in some cases, extremely unhappy – and found the prospect of working for 721, a smaller company run by Larry and affiliated with J&K, appealing. J. Antonucci Dep. 41-44; Fagan Dep. 39, 46-48; Mateus-Martins Dep. 23; McLaughlin Dep. 30, 76; Moss Dep. 92. It is undisputed that the coordinated resignation and timeline were conditions imposed by Larry. All of the employees complied with OHL's notice requirements, and it is not disputed that they worked diligently to assist with the transition.

Speculation that flatly contradicts the record evidence does not create a "genuine" dispute of fact. Presuming that the timing of the collective departure might constitute unfair

21

competition, there is absolutely no evidence that the OHL employees helped to plan it.  I will accordingly grant summary judgment for the individual defendants on this count.

### G. Defendants' Counterclaims

Finally, the defendants move for attorneys' fees, expenses and costs pursuant to the PUTSA, 12 Pa. C. S. A. § 5305, and Rule 54 of the Federal Rules of Civil Procedure.  Although a number of OHL's claims lack support in the record, it is not apparent that the claim of misappropriation was made in bad faith, or that an award pursuant to Rule 54 is otherwise warranted at this time.  The motion is denied without prejudice.

## IV.   CONCLUSION

For the reasons discussed, I will award summary judgment as follows:  On Count II (misappropriation of trade secrets), in favor of all defendants except 721, Larry Antonucci and John Ercolani; on Count III (unfair competition), in favor of all defendants except Larry Antonucci and 721; on Count IV (breach of contract), in favor of Evan Moss; and, on Counts V (tortious interference) and VII (breach of the duty of loyalty), in favor of all named defendants. This results in judgment for the 721 employees – Fagan, Mateus-Martins, McLaughlin, Miceli, Moss, Pannell and Zimmerman – on all claims against them.

The surviving substantive claims are misappropriation of trade secrets, against 721, Larry Antonucci and Ercolani (Count II); unfair competition, against 721 and Larry Antonucci (Count III); breach of contract against Ercolani (Count IV); and conspiracy to engage in unfair competition, against 721, Larry Antonucci, Ercolani, Lynette Keffer, Raymond Keffer, and J&K (Count VI).

An implementing order follows.