IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| OZBURN-HESSEY LOGISTICS, LLC | : |
| Plaintiff | : |
| v. | : Civil Action No. 2:12-CV-00864-SD |
| 721 LOGISTICS, LLC (d/b/a J & K FRESH EAST), ET AL. | : |
| Defendants | : |

**PLAINTIFF OZBURN-HESSEY LOGISTICS, LLC'S RESPONSE IN OPPOSITION TO
J & K FRESH DEFENDANTS RULE 52(C) MOTION**

I.  INTRODUCTION

Plaintiff Ozburn-Hessey Logistics ("OHL") submits the following opposition to Defendant J & K Fresh LLC, Lynette Keffer and Raymond Keffer's ("J & K Fresh Defendants") Rule 52(c) motion for a judgment as a matter of law.  As argued more fully below, OHL established at trial that J & K Fresh Defendants conspired with 721 Logistics, Lawrence ("Larry") Antonucci and John Ercolani to unfairly compete with OHL by orchestrating the mass resignation of OHL's perishable division in order to cripple OHL's ability to clear perishables and position themselves to convert OHL's customers.  Specifically, the trial evidence indicates that:

- J & K Fresh Defendants met with Larry Antonucci and John Ercolani, a current OHL employee subject to a restrictive covenant, on February 4-5, 2011, to discuss the creation of 721 Logistics and the establishment of a business relationship between J & K Fresh and 721 Logistics, without regard for John Eroclani's duty of loyalty to OHL or his restrictive covenant.  (Trial Transcript, Testimony of John Ercolani, June 30, 2014, pg. 65:13-66:18).

- At the February 4-5 meeting, J & K Fresh Defendants, Larry Antonucci and John Ercolani discussed the key components of "the deal" that would birth 721 Logistics d/b/a J & K Fresh East by crippling OHL's perishable division. (Exhibit 2, Feb. 7, 2011 email from Larry Antonucci to Lynette Keffer; Trial Transcript, Testimony of John Ercolani, June 30, 2014, pg. 65:13-66:18).

- J & K Fresh Defendants had an "understanding" with Larry Antonucci that 721 Logistics would be staffed **exclusively** by OHL's perishable division and that those employees would be required to resign *en masse* during the height of the perishable fruit season. (Exhibit 13, Oct. 28, 2011 email between L. Antonucci and Lynette Keffer; Exhibit 15, June 2, 2011 email between Mark Burton and L. Antonucci; Trial Transcript, Testimony of Lawrence Antonucci, July 1, 2014, pg. 144:16-21, 188).

- Lynette Keffer directly expressed her malicious intent to cripple OHL when she wrote to Larry Antonucci "Some will come immediately, others will wait until there are problems with their clearance." (Exhibit 12, January 20, 2012 email between L. Antonucci and Lynette Keffer ).

This evidence is sufficient to establish that J & K Fresh Defendants engaged in a conspiracy to cripple OHL's ability to clear produce in order to convert OHL's customers, J & K Fresh Defendants intended to cripple OHL because they knew that was the only way that 721 Logistics would get customers, and, more importantly, make their business arrangement with 721 Logistics profitable. Accordingly, J & K Fresh Defendants' Rule 52(c) motion should be denied.

## II.   ARGUMENT

### A.   Standard for a Rule 52(c) Motion

Rule 52(c) allows a court to enter judgment as a matter of law against a party at any time after that party has been fully heard on an issue. EBC, Inc. v. Clark Building System, Inc., 618 F.3d 253, 272-73 (3d Cir. 2010). In considering whether to grant judgment under Rule 52(c), a court uses the same standard of proofs and weights the evidence as it would at the conclusion of

trial.[1]  Id.  Finally, if a court enters judgment under Rule 52(c), it must make findings of fact and conclusions of law pursuant to Rule 52(a).  Id.

        **B.**      **The Weight of the Evidence at Trial Supports a Finding That J & K Fresh Defendants Unlawfully Conspired Against OHL.**

Plaintiff produced evidence at trial sufficient under the analysis in Reading Radio to justify both the denial of J & K Fresh Defendants Rule 52(c) motion and an entry of judgment in its favor against J& K Fresh Defendants on OHL's civil conspiracy claim.  To prove a cause of action for civil conspiracy, a plaintiff must show that "two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means.  Reading Radio, 833 A.2d at 212.  Proof of malice, or intent to injure, is also an essential element of civil conspiracy.  Id. (citing Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (1979)). Further, a civil conspiracy is not actionable until "some overt act is done in pursuance of the common purpose or design and actual legal damage results."  Baker v. Rangos, 324 A.2d 498, 506 (Pa.Super. 1974).  Direct evidence of conspiracy is not required, rather, all of the above elements may be proven circumstantially by subsequent acts of the alleged conspirators so long as the evidence is "full, clear and satisfactory."  Reading Radio, 833 A.2d at 212.

In Reading Radio, the Pennsylvania Superior Court determined that the plaintiff had produced sufficient evidence to justify a jury verdict in its favor on the civil conspiracy claim. 833 A.2d at 212-13.  The plaintiff proffered circumstantial evidence that 1) shortly after the defendant supervisor tendered his resignation, two sales employees on his staff also tendered their resignation, 2) defendant supervisor had discussions with his two sales employees regarding

---

[1] In addition to this response, Plaintiff also incorporates its Supplemental Findings of Facts and Conclusions of Law as an additional response to J & K Fresh Defendants Rule 52(c) motion.

employment with defendant WEEU, plaintiff's radio competitor, and 3) defendant supervisor had an "understanding" with defendant WEEU regarding employment opportunities for plaintiff's sales employees. *Id.* The court wrote that a jury could infer a conspiracy existed on these facts and "malice is shown in this agreement because it was made in disregard of [Defendant] Kline's (supervisor) duty of loyalty to [plaintiff] and [plaintiff's] contract rights with Fink and Ulrich (sales staff) at a time when Plaintiff was already shorthanded." *Id.*

### 1. Evidence of a conspiracy

Plaintiff produced evidence at trial substantially similar to that in Reading Radio. In both cases there was a mass resignation, an "understanding" as to future employment with a competitor, and a meeting with an employee subject to restrictive covenants and a duty of loyalty to discuss the creation of a competing business. Here, as in Reading Radio, this evidence proves that a conspiracy existed to cripple OHL. First, similar to the simultaneous resignation of Reading Radio's two best sales persons, OHL's entire perishable division resigned *en masse* on January 6, 2012. J & K Fresh Defendants, like the defendants in Reading Radio, were undisputedly aware of the mass resignation as late as January 2-3 2012, and according to the contemporaneous email record, as early as October 2011. (Exhibit 13, Oct. 28, 2011 email between L. Antonucci and Lynette Keffer).

Second, like the defendant radio station's "understanding" as to who would be hired at the competing radio station in Reading Radio, J & K Fresh Defendants had an "understanding" with Larry Antonucci regarding the sole solicitation and hiring of OHL employees to staff 721 Logistics. During the negotiations of the Licensing Agreement, 721 Logistics originally required J & K Fresh Defendants to recruit the employees for 721 Logistics because of Larry Antonucci's non-solicitation agreement. (Exhibit 15, June 2, 2011 email between Mark Burton and L.

Antonucci). That agreement prohibited Larry Antonucci from soliciting employees from OHL. (Trial Transcript, Testimony of Lawrence Antonucci, July 1, 2014, pg. 144:16-21, 188). Therefore, 721's plan to have J & K Fresh recruit employees to circumvent Larry Antonucci's covenants proves that J & K Fresh Defendants were aware of Larry Antonucci's intent to hire OHL's employees.

Additionally, in October 2011, Larry Antonucci explained to Lynette Keffer the timeline for his plan to recruit OHL's entire perishable division, have them resign *en masse* and begin work for 721 Logistics. Lynette Keffer expressly agreed, writing, "that sounds good." (Exhibit 13, Oct. 28, 2011 email between L. Antonucci and Lynette Keffer). It is simply not credible that a sophisticated business women like Lynette Keffer would risk her business reputation and brand name without knowing certain key details of 721 Logistics, including who Larry Antonucci intended to hire. (Trial Transcript, Testimony of Lynette Keffer, July 1, 2014, pg. 96:7-11).

Third, similar to the Defendants in <u>Reading Radio</u>, J & K Fresh Defendants met with John Ercolani, an OHL employee subject to a restrictive covenant and a duty of loyalty, and Larry Antonucci to discuss the formation of a competitor company, 721 Logistics, and the creation of a joint business relationship without regard to John Ercolani's duty of loyalty or his restrictive covenant. At trial, John Ercolani admitted for the first time that business was discussed at the February 4-5th meeting and that he knew Larry Antonucci was going to California to pitch a business idea to Lynette Keffer. (Trial Transcript, Testimony of John Ercolani, June 30, 2014, pg. 65:13-66:18). Further evidence that a business deal was discussed is the contemporaneous email record which indicates that after the February 4-5th meeting, Larry Antonucci consulted with his tax advisor to discuss the financial consequences of the "deal" and Larry Antonucci expressed hope that John Ercolani and he could build a successful family

business on the east coast like J & K Fresh had done on the west coast. (Exhibit 2, Feb. 7, 2011 email from Larry Antonucci to Lynette Keffer). Just as in Reading Radio, these facts are sufficient to infer that a conspiracy existed to cripple OHL's ability to clear produce and convert its customers.

### 2. Evidence of malice

The final element for a conspiracy, malice, is directly evidenced by Ms. Keffer and Mr. Antonucci's intention and expectation that OHL will be unable to "clear" perishable shipments after the raid. Lynette Keffer expressed her desire to cripple OHL when she wrote to Larry Antonucci; "Some will come immediately, others will wait until there are problems with their clearance." (Exhibit 12, January 20, 2012 email between L. Antonucci and Lynette Keffer ). Larry expressed nearly identical sentiments to Lynette Keffer when he wrote, in reference to two OHL clients, "Met with LGS and Kopke today ... no committals but we will see what happens when the ball gets dropped on them as well." (Exhibit 36, Jan. 31, 2012 email between L. Antonucci and Lynette Keffer)." These contemporaneous emails, and not their post hoc self-serving testimony, should be credited and underscore that Lynette Keffer and Larry Antonucci planned the mass resignation for the sole purpose of crippling OHL and converting OHL's customers.

The malice element also can be inferred, as in Reading Radio, from J & K Fresh and 721 Logistics' disregard of OHL's contract rights with its employees and customers. For example, similar to the defendants in Reading Radio, J & K Defendants, here, met with an OHL employee, John Ercolani, and discussed, in his "presence," the creation of a competing business. This was done without regard for Mr. Ercolani's own restrictive covenant and his duty of loyalty

to OHL. J & K Fresh Defendants did this because John Ercolani was part of the "team" Larry Antonucci was pitching.

Additionally, the malice element can also be inferred from the timing of the mass resignation. The timing of the mass resignation was deliberately planned for the height of the Peruvian fruit season and the beginning of the Chilean fruit season, January to March, to have maximum disruptive effect on OHL. Lynette Keffer testified that her expectation was the only way J & K Fresh East would get clients, because J & K Fresh East was opening business in the middle of the perishable season, was if importers' clearances were not handled properly. (Trial Transcript, Testimony of Lynette Keffer, July 1, 2014, pg. 58:17-59:1 "if they have a problem then they might consider changing mid-season;" Trial Transcript, Testimony of Ed Fitzgerald, June 30, 2014, pg. 145:17-21 "[a]n importer will not generally leave a customs broker unless there's due reason, so there's very low turnover."). This testimony, coupled with the fact that all of the customers J & K Fresh East solicited were OHL customers and 80% J & K Fresh West's Chilean clients used OHL on the east coast means that Lynette Keffer and Larry Antonucci had to cripple OHL for their east coast business venture to succeed. (Exhibit 11, J & K Fresh East Customer Pipeline; Exhibit 7, April 18, 2011 email between Ms. Keffer and Mr. Burton).

Finally, J & K Fresh Defendants are not absolved of their misconduct because they may have had a generalized "business interest" in developing a relationship with an east coast broker. The way that J & K Fresh executed that interest by crippling OHL and converting its customers, evidences the malice necessary for an actionable civil conspiracy claim. To be sure, in Reading Radio, there was no dispute that the competing radio station had a business interest in growing and strengthening its radio station. However, the Court found malice in the manner in which the defendant radio station achieved that business end, i.e. attempting to cripple Reading Radio in

order to convert its customers. Similarly, J & K Fresh Defendants' method for developing an east coast brokerage, crippling OHL's perishable division in order to convert its customers, evidences the requisite malice to enter a judgment in favor of OHL.

## III. CONCLUSION

For all the foregoing reasons, Plaintiff Ozburn-Hessey Logistics respectfully requests that this Court deny J & K Fresh Defendant's Rule 52(c) motion.

Respectfully submitted,
/s/ Brian A. Casal
Brian A. Casal PA I.D. No. 89983
BUCHANAN INGERSOLL & ROONEY PC
Two Liberty Place
50 S. 16th St., Suite 3200
Philadelphia, PA  19102
Phone:  215-665-8700 Fax:  215-665-8760 (fax)

Attorneys for Plaintiff Ozburn-Hessey Logistics, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of July, 2014, I caused a true and correct copy of the foregoing Plaintiff Ozburn-Hessey Logistics, LLC's Response in Opposition to J&K Fresh Defendants Rule 52(C) Motion to be filed and served via the Court's electronic filing service upon the following:

        Steven K. Ludwig
        FOX ROTHSCHILD LLP
        2000 Market St., 20th Floor
        Philadelphia, PA 19103
        sludwig@foxrothschild.com
        *Attorneys for Defendants 721 Logistics, LLC;*
        *Lawrence Antonucci; and Evan Moss*

        Barbara K. Gotthelf
        McCARTER & ENGLISH, LLP
        BNY Mellon Center, Suite 700
        1735 Market St.
        Philadelphia, PA 19103
        bgotthelf@mccarter.com
        *Attorneys for Defendant*
        *J & K Fresh, LLC*


        /s/Brian A. Casal
        BRIAN A. CASAL