IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OZBURN-HESSEY LOGISTICS, LLC | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| 721 LOGISTICS, LLC, *et al.* | : | No. 12-0864 |

**MEMORANDUM**

**Restrepo, J.**                                                                  **August 15, 2014**

Moroccan clementines, Peruvian grapes and New Zealand kiwis travel an Odyssean journey to arrive on United States grocery-store shelves.  Among other obstacles, there is customs clearance:  When imported perishable goods reach U.S. shores, they must be inspected, documented and approved by U.S. Customs and Border Protection before they are shipped to their final destinations.  The business of assisting import companies with this process is known as customs brokerage; the process itself, perishables clearance.

This case concerns "broker wars" in the Port of Philadelphia – specifically, the lift-out of a team of employees from Ozburn-Hessey Logistics, LLC ("OHL") to launch a new customs brokerage firm, 721 Logistics, LLC ("721").  OHL claims that former employee Lawrence ("Larry") Antonucci conspired with a West Coast competitor, J&K Fresh, LLC ("J&K"), to lift out the core members of OHL's perishables division at the peak of the perishables import season in order to inflict catastrophe on OHL and convert its customers.  OHL brought suit against 721, J&K, and the individuals involved in launching 721, alleging misappropriation of trade secrets, unfair competition, breach of contract, tortious interference with contracts, civil conspiracy, and breach of the duty of loyalty.

On April 7, 2014 I granted summary judgment in favor of the defendants on the majority of OHL's claims.  *See Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, No.12-0864, ---

F.Supp.2d ----, 2014 WL 1364506 (E.D. Pa. Apr. 7, 2014).  Four claims survived:  (1)

misappropriation of trade secrets, against 721, Larry Antonucci and John Ercolani; (2) unfair

competition, against 721 and Larry Antonucci; (3) conspiracy to commit unfair competition,

against 721, Larry Antonucci, John Ercolani, J&K, Lynette Keffer and Raymond Keffer; and (4)

breach of contract, against John Ercolani.  A bench trial was held from June 30 to July 2, 2014.

This decision follows.

## I.   FINDINGS OF FACT[1]

### A.   The Parties

OHL is one of the largest third-party logistics companies in the world.  Tr. 1 at 164, 306-

07.  It provides "integrated global supply chain management solutions including transportation,

warehousing, customs brokerage, freight forwarding and import or export consulting services."

*Id.* at 164.  Of OHL's 7,000 employees worldwide, approximately 750 work in customs

brokerage.  *Id.*  In the United States, OHL clears imported perishable goods through customs in

Los Angeles, Miami, New York and Seattle, as well as Philadelphia.  *Id.* at 158-59, 179, 256-60.

Philadelphia is a major perishables port; roughly 150 companies import perishables through it.

Tr. 1 at 319; Tr. 2 at 54, 111.  Before the launch of 721, OHL served as customs broker for most

of them.  Tr. 1 at 123, 147.

---

[1] Citations to the trial record are intended to be illustrative of relevant evidence, but are not exhaustive;
the findings of fact are premised on the trial record as a whole.  The designations Tr. 1 at ___, Tr. 2 at
___, and Tr. 3 at ___, refer to the first, second and third days of trial testimony, respectively.  The
designation Ex. __ refers to a stipulated trial exhibit.  *See* ECF 138.  For clarity's sake, I will use first
names to refer to Larry Antonucci, Lynette Keffer and Raymond Keffer, as the parties and the Court have
done throughout this litigation.  The findings of fact are not numbered.  *See Ass'n of Westinghouse
Salaried Emps. v. Westinghouse Elec. Corp.*, 283 F.2d 93, 94 (3d Cir. 1960) ("The court did not make
findings in numbered paragraphs. But it did file an opinion which contains findings which is a permissible
method under the rule.") (citing Fed. R. Civ. P. 52(a)).

The protagonists of this lawsuit are Defendants Larry Antonucci and Lynette Keffer. Both are licensed customs brokers who have built their careers in the logistics industry. Ex. 67; Tr. 1 at 340, 347. Lynette Keffer began as a secretary for United States Customs in 1966. Tr. 1 at 344-45. She subsequently worked for a series of customs brokerage firms on the West Coast, including one that she bought and ran before merging it with another company, Jones & Klink. *Id.* at 345-47. In 2000, Lynette and her former partner Ross Jones decided to spin off a new customs brokerage firm from Jones & Klink. *Id.* They founded J&K Fresh, LLC ("J&K") with the intention of filling a "niche" in the perishables clearance business by providing better customer service than larger competitors. *Id.* Jones later retired, and Lynette bought his share of the business. Tr. 1 at 354. She now owns ninety-nine percent of the firm; her husband owns one percent. *Id.*

J&K operates on the West Coast exclusively, clearing perishables through customs in California and, remotely, through ports in Houston and Seattle. Tr. 1 at 341. The company employs twenty-four people. *Id.* at 350-51. Lynette is Chief Executive Officer; her son, Defendant Raymond Keffer, is Vice President of Operations; the third in command is Executive Vice President Robert Lee Hoy. *Id.* at 340, 347-50, 362-63; Tr. 2 at 8-9. Under Lynette's stewardship, J&K has built a powerful brand. Tr. 2 at 80, 82, 110, 222. It has no sales force, but has nonetheless doubled its business since 2001 on the strength of its reputation. Tr. 1 at 351.

Larry began working for Barthco International, Inc. ("Barthco"), a Philadelphia-based logistics firm, in 1981, ultimately serving as its president. Tr. 1 at 25; Tr. 2 at 85, 109, 203. In 2006, Barthco became part of OHL, and Larry became President of OHL's Global Freight Management and Logistics Division for the Americas. Pl.'s Second Am. Compl. & Ans. ¶ 4; Ex. 62 at 59; Tr. 2 at 109. He left OHL in 2009 by "mutual termination." Tr. 2 at 109. He had

signed two covenants with OHL:  a non-compete covenant that expired on December 31, 2010, and a non-solicitation covenant that expired on December 31, 2011.  Ex. 103; Tr. 1 at 28-29.

In January of 2012, Larry launched 721 Logistics, LLC ("721"), of which he is now Chief Executive Officer.  721 is a customs brokerage firm that primarily clears produce through the Port of Philadelphia.  It is owned by Larry, his brother John Antonucci and his cousin John Ercolani.  Exs. 4, 9, 50; Tr. 1 at 52; Tr. 2 at 188.  At present, 721 is staffed exclusively by former Barthco/OHL employees.  Tr. 2 at 188.  By virtue of a Licensing Agreement with J&K, 721's produce division does business as J&K Fresh East.  Ex. 4.  721 d/b/a J&K Fresh East now serves as customs broker for a significant percentage of OHL's former Philadelphia clients.  Tr. 1 at 123-47.

The last individual defendant, John Ercolani, is Larry's cousin and a former OHL employee.  In January of 2012 he left his position as an import supervisor at OHL to join 721, of which he is now Vice President of Operations and a part owner.  Tr. 1 at 18, 52, 77.

### B.    First Steps Toward J&K Fresh East:  The February 4, 2011 Meeting

Larry and Lynette first spoke in January of 2011.  After a year of unemployment, Larry had decided to get back into the customs brokerage business.  Tr. 2 at 109-10, 117.  He respected J&K, and in January of 2011 called Lynette "to see if she would be interested in bringing her brand to the east coast."  Tr. 2 at 110.

Lynette had dismissed similar calls in the past, but listened to Larry because she respected his Barthco pedigree and because his call came at the right time.  *Id.* at 355.  Lynette had become acutely aware of her globalizing competition:  The national trend was that "smaller companies were being taken over by bigger companies," some of which offered "door-to-door" logistics services on a national or global scale.  *Id.* at 341, 355-56.  The consolidation of its

competitors put J&K at a competitive disadvantage.  It also meant that Lynette could no longer trust "handshake agreements" with other small customs brokerage firms for mutual business referral.  *Id.*  J&K customers, meanwhile, were urging Lynette to develop an East Coast presence.  *Id.* at 343.  She was intrigued by Larry's call, and the two of them arranged to meet in person at Lynette's office on February 4, 2011.  *Id.* at 356-57; Tr. 2 at 112.

Larry's cousin, John Ercolani, heard that he was traveling to California to meet with Lynette and asked to come along.  Tr. 1 at 43-44; Tr. 2 at 117-18.  Ercolani was then employed by OHL.  I credit Ercolani's testimony that he asked to go because Lynette was an icon in the field and he wanted to meet her.  Tr. 1 at 46, 49.  Larry did not ask him to attend or to participate in the potential partnership.  Tr. 2 at 122-23, 133.  Lynette testified that the presence of a competitor's employee at this meeting did not concern her because it was a very general meeting. Tr. 1 at 357-58; Tr. 2 at 76.  I credit this testimony as well.   Ercolani did know ahead of the meeting that Larry intended to pitch Lynette to embark on a joint business venture.  Tr. 1 at 66.

In advance of the meeting, Larry and Lynette corresponded by email.  Among other things, they agreed to keep the purpose of their meeting secret.  Tr. 1 at 44, 358; Tr. 2 at 120-26. They had sound business reasons for doing so.  Neither wished to provide grist for the rumor mill of the insular customs brokerage industry, and Larry did not want OHL to imagine that either he or Ercolani might be violating any covenant with OHL.  Tr. 2 at 120-22.  Lynette, whose staff was already unsettled by the departure of Ross Jones, did not want to foment speculation about the future of J&K.  Tr. 1 at 358-59.  Lynette therefore told Larry, by email, that if anyone at J&K asked about Larry and John she would say they were client prospects.  Tr. 123-25.  When they arrived, Larry and John signed in as affiliates of "Antonucci Ventures."  Tr. 2 at 126.

The only substantive business discussion at the February 4 meeting was between Lynette and Larry.  They explained their respective backgrounds and business aspirations, and they talked in general terms about the possibility of a future partnership on the East Coast.  Tr. 1 at 66, 359.  Lynette felt that she was "stretched too thin" financially for an eastward expansion because she was in the process of buying out Jones' share of J&K.  *Id.* at 360-61.  Larry suggested that he might be able to loan her money.  *Id.*; Tr. 2 at 130.  He also told Lynette that he "had covenants" and "couldn't open a business" until January 2012, which Lynette took to mean that he could not conduct any type of business until that date.  Tr. 1 at 360; Tr. 2 at 29-30, 93, 103.  At the close of the meeting, Larry agreed to investigate the possibility of a loan, and Lynnette agreed to discuss the idea with Raymond and Robert Lee Hoy.  Tr. 1 at 362; Tr. 2 at 130.  Lynette and Larry did not discuss or agree to any further details, except that they would keep talking.  Tr. 1 at 362-63; Tr. 2 at 8-9, 129-30.

John Ercolani sat through the meeting and heard, but did not participate in, the substantive business discussion.  Tr. 1 at 65-66, 357; Tr. 2 at 117.  At one point Raymond came in to introduce himself and say hello, but did not stay more than a few minutes.  Tr. 1 at 64, 357.  Later that evening, Lynette and Raymond hosted John, Larry and Robert Lee Hoy for dinner and margaritas at the Keffers' house, but the event was purely social; no one discussed the potential partnership at all.  Tr. 1 at 64; Tr. 2 at 8, 127.

### C.   Negotiations

The primary goal of the February 4 meeting was for Larry and Lynette to see whether they liked each other, shared common values, and could envision working together.  They did, and could.  Tr. 1 at 66, 364; Tr. 2 at 7, 9, 112.  After the meeting, Lynette enlisted her business advisor, Mark Burton, to assist her in ongoing discussions with Larry.  Tr. 2 at 9-10.  Throughout

the spring of 2011, Larry, Lynette and Burton corresponded about the possibility of opening an East Coast branch of J&K.  Tr. 2 at 11.  In April, at Burton's request, Lynette sent him an email explaining her goals and motivations for the project, which I credit in its entirety.  Ex. 7; Tr. 2 at 15-17.  The email explained:  "My primary reason for wanting to go forward is to take the first step in establishing us on the east coast to help protect us against the larger companies."  Ex. 7.  In her own terminology, Lynette hoped to "close the back door" – that is, to eliminate the opportunity for larger competitors like OHL to convert J&K clients by offering them bi-coastal customs clearance.  Tr. 1 at 340-41; Tr. 2 at 68; Exs. 7, 41.

Around May, negotiations faltered.  Tr. 2 at 11.  Burton was concerned that there was no formal business plan and that Larry had not disclosed his potential partners in the venture.  Tr. 1 at 12.  Lynette did not want the responsibility of hiring or managing the employees in an East Coast office, but nor was she willing to delegate the pivotal role in a J&K expansion to another person.  Tr. 2 at 10-13, 94-96.  Larry, for his part, wanted a business of his own.  Tr. 1 at 12.  The J&K-expansion plan was therefore tabled.  Tr. 2 at 13.  Burton suggested that, instead, J&K could license its brand to a separate company on the East Coast that Larry would run.  Tr. 2 at 13, 17-18.  The negotiations shifted to this concept.  *Id.*

Also in May of 2011, Larry held a meeting at Hathaway's Restaurant with Ercolani, John Antonucci, and Leo Garonski, a lawyer and Antonucci family friend who had periodically provided legal counsel for all three men.  At that time both John Antonucci and Ercolani remained employed by OHL.  The group sought legal counsel from Garonski on an issue that concerned them all – presumably the possibility of starting a competing business together.  Tr. 1 at 55-58; Tr. 2 at 160; Tr. 3 at 139, 144, 160.

### D.    The Licensing Agreement

Larry and Lynette eventually reached an agreement:  Larry would launch an independent customs brokerage firm – 721 Logistics, LLC – but would license the J&K name and brand for 721's perishables division, which would do business as J&K Fresh East.  In exchange, J&K would receive a percentage royalty from J&K Fresh East's gross profits.  Ex. 4.  Both parties entered into this agreement for compelling business reasons.  Lynette could "close the back door" by offering J&K clients high-quality customs brokerage on both coasts, but without the burden of operating an East Coast office.  Tr. 1 at 340-41; Tr. 2 at 18-19, 68, 91; Exs. 7, 41. After a decade at the helm of J&K, she also wanted to ensure that the company could survive and thrive without her, and she felt more secure knowing that the partnership with 721 would provide a support structure for J&K.  *Id*.  On Larry's end, the J&K brand would lend 721 instant credibility and a substantial customer base.  Tr. 2 at 222-23; Exs. 4, 11.

In October of 2011, Lynette came east to sign the Licensing Agreement.  Raymond came as well.  The Agreement required 721 to adhere to J&K pricing, procedures and quality standards.  Ex. 4 at 391; Tr. 2 at 18-19, 21.  Because Lynette was concerned about the possibility of another company acquiring 721 and the use of the J&K brand, it also contained a provision granting each party a right of first refusal in the event that the other decided to sell any ownership interest.  Ex. 4 at 392.  The provision exempted each party's "management team or prospective management teams," which would have "the right to purchase an interest in their business," and required each party to disclose the members of those teams.  Ex. 4 at 392; Tr. 2 at 19.  Lynette (on behalf of J&K) listed Raymond and Robert Lee Hoy.  Ex. 118.  Larry (on behalf of 721) listed Ercolani and John Antonucci.  *Id*.  This led both Lynnette and Raymond to assume that Ercolani and John Antonucci would be involved in 721.  Tr. 2 at 26-27, 234-35.

Finally, the Agreement provided that 721 would pay any legal fees incurred by J&K in defending any lawsuit by OHL.  Ex. 4 at 396-97; Tr. 2 at 27-29.  Burton insisted that this provision be added.  Tr. 2 at 100-01.  To Lynette's understanding, the only ground for concern about potential litigation was that Larry had covenants with OHL and that "sometimes big companies sue smaller companies to try and do them harm."  Tr. 2 at 100-01.

Larry and Lynette executed the Licensing Agreement on behalf of 721 and J&K on October 19, 2011.  Ex. 4; Tr. 2 at 20-21.  That evening, Larry and his wife hosted Raymond and Lynette for an Italian dinner at their home.  Ercolani, John Antonucci and their spouses also attended.  The dinner was social.  Larry asked Lynnette and Raymond not to talk about the Agreement at the dinner, and business was not discussed.  Tr. 1 at 27; Tr. 2 at 30-32.

### E.    721 d/b/a J&K Fresh East Prepares to Launch

It was agreed that 721 would launch in January of 2012.  Lynette initially resisted this timing; January was the height of the winter produce season, and importers generally do not switch customs brokers at that time.  She recommended that 721 launch in either October or April instead.  Larry, however, wanted to open the business as soon as his second covenant expired, and Lynette eventually relented.  Tr. 1 at 87-88; Tr. 2 at 35-37, 196-97.

It was also agreed that Larry would do all of the necessary hiring for 721.  Lynette did not want to be involved.  Tr. 2 at 19.  Larry told Lynette that he planned to reach out to people he knew in the industry, but, because of his covenants, refused to tell her whom.  Tr. 2 at 33-34, 38; Tr. 3 at 10-11.  Lynette imagined that he would recruit from among his acquaintances in the Philadelphia perishables world, and she trusted him to hire wisely.  Tr. 2 at 19, 38-39, 91; Tr. 3 at 10-11.

On December 19, 2011, J&K emailed a "news blast" to its customers announcing the creation of J&K Fresh East.  Ex. 19 at 295; Tr. 2 at 32-33.  Larry and Lynette drafted the email. Tr. 2 at 33.  It included the assurance that "J&K Fresh East will be staffed with dedicated and experienced professionals who know and understand your business."  Ex. 19; Tr. 2 at 33.  At that point, neither Lynette nor Raymond knew whom Larry intended to hire, but they trusted that anyone he did hire would fit the description.  Tr. 2 at 19, 38-39, 45, 91; Tr. 3 at 10-11.  Lynette, furthermore, did not feel it necessary to have all the details in place because she did not expect that 721 would acquire customers in January.  Tr. 2 at 34-37.  J&K received a number of positive responses to the news blast, which Raymond and Lynette shared with Larry.  Tr. 2 at 43-45.

### F.    Launch of 721 d/b/a J&K Fresh East

On January 1, 2012, at a New Year's Day family party, Larry offered Ercolani a job at 721.  Tr. 1 at 22-25.  He also called a number of prospective employees then employed by OHL and invited a total of nine people to an open house at the 721 offices the following day:  John Antonucci, John Ercolani, William Fagan, Helena Martins, Michael McLaughlin, Maura Miceli, Evan Moss, Antoinette Pannell, and Barbara Zimmerman.  Tr. 3 at 40-43, 68-69, 78.  All were employees in OHL's perishables division except for John Antonucci, who was a Vice President of Global Account Management (a sales position).  Tr. 1 at 236; Tr. 2 at 142; Tr. 3 at 45; Ex. 56. All were employed at will, and all were former employees of Barthco.  Tr. 1 at 18; Tr. 2 at 195-96.  January 1 was the first time that Larry spoke to any of the prospective employees about 721, aside from his brother and cousin.  Tr. 2 at 196.

All of those invited, except for Moss, came to the open house on January 2.  Tr. 3 at 43. Larry first met with the group and explained his general vision for 721.  Tr. 3 at 43-45, 79.  He then met individually with each prospective employee and made offers of employment.  Tr. 3 at

10

45-46, 81.  As a condition of the offer, Larry required that each employee resign from OHL on January 6.  Ex. 21.  Larry made the same offer to Moss by phone on January 3.

Within a few days, all nine OHL employees accepted Larry's offer.  Ercolani was concerned about his family's financial security, did not see a future for himself at OHL, and felt that 721 was a better opportunity.  Tr. 1 at 19-20.  He was also eager to work with his cousin and "had a lot of faith" in Larry.  Tr. 1 at 20-25.  Pannell and Fagan, the only other members of the group who testified at trial, had been extremely unhappy at OHL.  Tr. 3 at 56-57, 72, 93-96, 103-05.  Both felt overworked and underappreciated.  The month before, when bonuses were distributed, Fagan had ostensibly been forgotten, despite his forty-year tenure with Barthco/OHL.  Tr. 3 at 103-04.  Both felt that joining a new family business run by Larry and affiliated with J&K was a great opportunity.  Tr. 3 at 56-57, 72, 93-96, 103-05.  Fagan, in fact, turned down a $100,000 retention bonus that OHL offered as an inducement to stay.  Tr. 3 at 104-05.

The nine employees submitted letters of resignation to OHL on January 6.  Ex. 21.  Larry instructed them to comply with OHL protocol by providing at least a two-week notice of departure, to follow OHL's instructions, to surrender all of OHL's property and to diligently assist with the transition and the training of their successors.  Tr. 1 at 197-98; Tr. 2 at 216.  The departing employees did so.  In the weeks after their resignation they continued to work late, trained their replacements, and actively sought to facilitate a smooth transition.  Tr. 1 at 69-70, 80-81, 185-87, 269; Ex. 62 at 39, 49.  Once they began work for 721, Larry required each new employee to sign a statement that he or she had returned all property belonging to OHL.  Tr. 1 at 68-69; Ex. 29.

11

After the nine employees had accepted Larry's offer, he called Lynette to tell her whom he had hired.  Tr. 2 at 51-53.  She was surprised; she had known that Larry intended to make eight or nine offers, but thought, like him, that only half would accept.  Tr. 2 at 51-52; Tr. 2 at 194.  Later in January, J&K sent a second news blast to its customers, announcing the opening of J&K Fresh East.  Ex. 3; Tr. 3 at 19-20.  Once again, Raymond and Lynette relayed positive responses to Larry for follow-up.  Exs. 6, 11; Tr. 2 at 56-57.

### G.    The Pipeline Spreadsheet

During the month of January, Larry created a "pipeline spreadsheet" of client prospects for J&K Fresh East.  Ex. 11; Tr. 1 at 38, 40-41; Tr. 2 at 197-228; Tr. 3 at 58.  The other 721 employees did not assist in its creation.  *Id.*  The spreadsheet included the names of Philadelphia produce importers and contact information for the relevant point person at each company.  Ex. 11.  Larry filled the spreadsheet, first, with contact information for J&K customers that he received from Lynette and Raymond.  Exs. 6, 11; Tr. 1 at 38, 40-41; Tr. 2 at 56-57, 187-88.  He then added information that he obtained through internet searches, trade sources and phone calls, a process facilitated by his own connections in the port community.  Ex. 66, 68, 69, 71, 83; Tr. 2 at 197-217; 220-22; 226-28.  On February 1, he sent the spreadsheet to Raymond and asked him to mark which of the companies listed were existing J&K clients.  Ex. 11.  Raymond did, and returned the spreadsheet within several hours.  *Id.*  721 used the spreadsheet to organize and track its client solicitation.  *Id.*; Tr. 3 at 58.

Nearly all of the companies on the spreadsheet were OHL customers on the East Coast, and nearly all of the contacts in the spreadsheet were the same contacts that OHL used to communicate with them.  Tr. 1 at 271-72.

### H.   OHL's Response

The mass resignation caused OHL significant difficulty in clearing produce through the

Port of Philadelphia for a limited time, and OHL's perishable division lost customers to 721.  Tr.

1 at 123-35, 138-44, 146-47, 249, 267.  In 2012, January was not only the peak of the winter

produce season; it also coincided with the implementation of "central exam stations" ("CES") by

U.S. Customs, which complicated the produce clearance process.  Tr. 1 at 62-63, 67, 107-12.

The division was not crippled, however.  Its leadership (Brian Riley, Randy Briggs, Joseph

Galeone, Tony Stevenson and Ed Fitzgerald) remained, as did many of its employees, and there

were OHL staff in other divisions capable of doing perishables work.  Exs. 53, 55, 62, 65; Tr. 1

at 90, 186-87, 196-96, 212-33, 250, 262, 282-85, 302, 307-08, 320-23; Tr. 3 at 93, 95.  After

considering whether to close the division, OHL management decided to "fight" to keep its

business.  Tr. 1 at 249-51, 268-69, 279.  It replaced the employees who left, except for Fagan,

whose position was eliminated.  Tr. 1 at 169, 287-88.  In March of 2012, announcing Galeone's

appointment to a new position, OHL declared on its website that  "[w]ith Galeone's 23 years of

logistics operations and management experience combined with the strength of OHL's

perishables operations team, OHL is presenting its customers with unmatched commercial and

operational support . . ."  Tr. 1 at 187-88.  OHL believed that public representation to be true.

Tr. 1 at 173, 188-90, 314.

OHL filed suit against 721, J&K, Larry and Evan Moss on February 17, 2012, alleging

misappropriation of trade secrets, unfair competition, breach of contract (against Moss) and

tortious interference with Moss' contract (against the other defendants).  ECF Doc. 1.  On

September 10, 2012, after substantial discovery, OHL amended its complaint by adding Lynette,

Raymond, and all eight of the other 721 employees as defendants, and by adding claims of

breach of contract (against Ercolani), conspiracy and breach of the duty of loyalty.  ECF 48.

OHL amended its complaint a second time on June 26, 2014 to clarify the nature of its

conspiracy claim.  ECF 125.

I.    **Additional Facts Regarding Misappropriation of Trade Secrets**

The customer contact information included in the 721 pipeline spreadsheet is widely

known outside of OHL.  Contact information for relevant personnel at produce import companies

is generally available in the public domain and easily acquired through internet searches and

trade media.  Tr. 1 at 39, 318-19; Tr. 2 at 65-70, 102; Tr. 3 at 50, 57-58, 97.  Import companies

themselves list contact information in advertisements and on product labels.  OHL's handbook

accurately states that "legitimate sources for competitive information include media reports,

public filings, customer reports, industry surveys and other public reports."  Ex. 59; Tr. 1 at 312-

13.  Trade publications like "the Blue Book" and Zepol reports contain ample contact

information for produce importers, including email addresses and phone numbers.  Ex. 73; Tr. 1

at 201-07, 294-96, 319.  OHL itself obtains customer contact information from Zepol, among

other sources.  Ex. 62 at 77-78, 130, 162-63, 187-88; Tr. 1 at 294-96, 319.

To the extent that the identities, email addresses and cell phone numbers of the relevant

personnel are not available in the public domain, anyone involved in the Port of Philadelphia or

customs brokerage communities can obtain the information by making a few phone calls.  Tr. 1

at 154-55, 185; Tr. 2 at 55-56.  As Pannell testified, it is "not rocket science."  Tr. 3 at 58-60.  I

fully credit Larry's testimony as to how he obtained the customer contact information, as well as

the testimony of Larry, Fitzgerald, Fagan and Pannell regarding its accessibility.  Tr. 1 at 184-85;

Tr. 3 at 58-60.

The individual client contacts in the pipeline spreadsheet are therefore not OHL's trade secrets. Moreover, Larry created the pipeline spreadsheet. The 721 employees did not. There is no OHL compilation at issue in this case; the only compilation of client contact information in evidence is the compilation created by Larry. No defendant took any property or trade secret of OHL. No defendant acquired or disclosed any trade secret of OHL.

### J.     Additional Facts Regarding Unfair Competition and Conspiracy

I find Larry's testimony regarding his motivations and plans for the launch of 721 to be credible. On the basis of that testimony, I find that Larry offered employment to nine OHL employees for the specific purpose of hiring skilled and gifted employees, and with no intention of crippling OHL's perishables division or of inducing the employees to commit wrongs against OHL.

The trial record demonstrates unequivocally that the individuals whom Larry recruited were gifted and skilled. Ercolani had an industry-wide reputation for competence and rigor. Tr. 1 at 19, 91; Tr. 2 at 78. Lynette's clients told her that after George Sibley, who was a legend in the field, Ercolani was the best person to hire. Tr. 2 at 78. Fagan had four decades of experience in perishables clearance. Tr. 3 at 96. As Traffic Manager for OHL's perishables division, he had adroitly managed what was by all accounts an intense and complex operation. Tr. 1 at 32, 90-98; Tr. 3 at 90-92. All members of the group were experienced and hardworking. They had expertise, relationships in the industry, respect for each other, and the respect of others. Inside and outside of OHL, they were perceived as the best in OHL's perishables division. *E.g.* Exs. 6, 48; Tr. 1 at 24, 32, 98-99, 102-04, 117-18, 121, 235, 268, 325, 334-35; Tr. 3 at 86, 90-92, 98-103.

Larry had no intent to cripple OHL or to induce its employees to commit wrongs against it.  He did not expect that all nine people to whom he offered jobs would accept; he hoped that half of them might.  Tr. 2 at 51-52, 99, 106, 194.  Nor did he think that the loss of eight perishables employees could hurt OHL very much even if they did all accept, given its size and resources.  Tr. 2 at 169-170, 193.  He did not target OHL's perishables division in order to paralyze it.  Rather, he recruited from among former Barthco employees because that was his "family business" and his network, and because they were the people with relevant experience.  Tr. 1 at 121; Tr. 2 at 195-96.  The reason that he chose to launch 721 in January was not that it was the height of the winter fruit season; if anything, that fact was a deterrent.  Nor was the implementation of the centralized exam stations a factor in Larry's plans.  Tr. 2 at 197.  Larry's sole reason for choosing January 2012 to launch 721 was that it marked the expiration of his covenants.  Tr. 2 at 196-97.

I also find the testimony of Lynette and Raymond credible.  On the basis of their testimony, and Larry's testimony, I find that there was no advance conspiracy to cripple OHL's perishables division by hiring away its key staff.  Lynette entered into the Licensing Agreement with 721 for legitimate business reasons: (1) to establish a J&K presence on the East Coast, and (2) to buttress the company's support structure for the future of the business.  The partnership did not involve any agreement to hire OHL staff in order to do OHL harm.  Lynnette, Raymond, and J&K were not involved in hiring for 721, and did not know that Larry would only make offers of employment to OHL employees.  Ex. 41; Tr. 1 at 362-63; Tr. 2 at 8-9, 13, 17-19, 21, 33-34, 76, 82-83, 89-90, 193-95, 234-35; Tr. 3 at 10-13, 23-25, 31-32.  Even if they had, neither Lynette nor Raymond would have believed that the loss of eight employees could cripple OHL's perishables operations.  Tr. 2 at 53-54; Tr. 2 at 237; Tr. 3 at 13, 19.  The partnership with 721 did

enhance J&K's brand value – as evidenced by the fact that OHL made an overture to buy J&K during the pendency of this litigation. Tr. 2 at 66-67. I credit the testimony of Lynette, Raymond and Larry as to the meaning of the various emails among them presented in evidence.

Nor was there any prior agreement to sabotage OHL between Larry and Ercolani. Ercolani did not know that he and John Antonucci would become partners in 721 until after January 1, 2012. Tr. 1 at 35-36. Prior to that date, Larry refused to tell him the specifics of what he was planning. Tr. 1 at 29-30. January 1, 2012 was the first time that Larry solicited his participation in 721. Ercolani did not agree to help Larry lift out OHL's perishables team in order to cripple OHL, did not participate in planning the coordinated resignation, and did not talk about 721 with the other OHL employees who were offered jobs until after they had accepted. Tr. 1 at 21, 36.

Finally, there was no prior agreement to lift out OHL's perishables team between Larry and any other person or entity. Larry honored his covenants with OHL for their duration. He did not solicit employees or clients of OHL until his non-solicitation covenant had expired. No 721 employee ever had any intention to cripple OHL's perishables division by helping to lift out the team that joined 721. As was apparent during trial, both Larry Antonucci and William Fagan are very fond of Ed Fitzgerald, who supervised the former OHL perishables employees, and hold him in high esteem. They had no intent to hurt him personally or professionally. Fagan's emotion was palpable on the stand whenever he spoke about Fitzgerald. It is clear, moreover, that the employees who left OHL valued Fitzgerald as a manager and that their unhappiness at OHL was not due to him.

Larry and Lynette did launch 721 in order to compete with OHL, along with other customs brokerage firms. Larry and 721 did lift out the core members of OHL's perishables

team at the height of the perishables season, which caused serious problems for OHL, and 721 did capitalize on OHL's difficulties by pursuing OHL clients.  Larry, Lynette and Raymond were thrilled at 721's success; several of the emails in evidence manifest their excitement – and some gloating.  Exs. 6, 12, 36; Tr. 2 at 174-81; Tr. 3 at 20-21.  None of this is evidence of any intent prior to 2012 to cripple OHL's perishables division by hiring away its core staff.  No defendant in this case ever had such intent.

### K.    Additional Facts Regarding the Breach of Contract Claim

While employed with OHL, Ercolani worked in operations.  Tr. 1 at 28, 32, 68, 90-91, 304.  On September 18, 2009, he was invited to apply for the position of Import Supervisor by Denise Lamb, OHL's Assistant Vice President of Human Resources (Americas).  Ex. 76; Tr. 1 at 73-74.  He completed the online employment application soon thereafter.  Ex. 76; Tr. 1 at 75.

On Tuesday, September 22, 2009, he was offered the position by letter.  Ex. 77; Tr. 1 at 75-76.  The letter was signed by Lamb on behalf of OHL, and contained the following language: "Please allow this letter to serve as confirmation of the employment offer terms extended to you. To review the offer, if you accept the position, your new compensation package will reflect the specifics outlined below."  Ex. 77.  The specifics included a salary figure and the statement that "[a]ll other existing benefits will remain unchanged and commensurate with the company plan." *Id.*  The letter also contained the following acknowledgement, with a space for Ercolani to sign:

> I accept the offer of employment with OHL and agree to the terms and conditions outlined in this letter.  I further acknowledge that changes may be made to the compensation and benefits packages at management's discretion.  My signature below also serves as confirmation that I am not restricted from performing my duties with OHL by a previously executed noncompetition/nonsolicitation agreement.

Ex. 77; Tr. 1 at 76-77.  The letter did not reference any other restrictive covenant or ancillary

agreement.  Ex. 77; Tr. 1 at 76.  Ercolani signed the acknowledgment and returned the letter to

OHL management on Friday, September 25, 2009.  Exs. 77, 78; Tr. 1 at 76-77.

On Monday, September 28, 2009, Lamb sent an email to Ercolani that read:  "Attached is

the last piece of the puzzle.  Please sign and return this form to me.  Thank you for your patience

throughout our new process."  Ex. 79.  The attachment was a "Confidentiality and

Nonsolicitation Agreement."  Exs. 79, 30; Tr. 1 at 78.  Ercolani did not want to sign the

agreement, and initially did not.  Tr. 1 at 52, 78-79.  At some point in October he expressed his

objections to OHL's human resources department, but was told that OHL would not alter the

agreement's terms and that his promotion "would be rescinded" if he did not sign.  Tr. 1 at 51-

52, 78-79.  Ercolani ultimately signed the agreement on October 27, 2009.  Tr. 1 at 51-52, 78-79.

He received no additional benefit for doing so.  *Id.*

The Confidentiality/Nonsolicitation Agreement provides that Ercolani "shall not, directly

or indirectly, for himself or on behalf of or in conjunction with any other person, solicit for

employment, otherwise attempt to hire, assist in the hiring of, or employ any employee of the

Employer."  Ex. 30 § 1.

Ercolani became a co-owner of 721 in May, 2012.  Ex. 50; Tr. 1 at 52.

## II.   CONCLUSIONS OF LAW

### A.   Jurisdiction and Governing Law

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  *See* Docs. 122,

136, 137 (OHL's Sec. Am. Complaint ¶¶ 9-27 and responses thereto).  Pennsylvania law applies.

*See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78-80 (1938). Where the law is unclear and there is

no controlling decision by the Pennsylvania Supreme Court, this Court must "predict" how it

would rule, giving "due regard, but not conclusive effect, to the decisional law of lower state courts." *Nationwide Mut. Ins. Co. v. Buffetta,* 230 F.3d 634, 637 (3d Cir. 2000).

### B.   Motion to Strike Testimony by OHL's Rule 30(b)(6) Witness

The defendants have moved to strike trial testimony by OHL employees that "contradicted, supplemented and expanded upon" the deposition testimony of OHL's Rule 30(b)(6) witness.[2]  Doc. 128 at 1.  They contend that the Rule 30(b)(6) deposition testimony is binding on the corporation, such that OHL is estopped from augmenting or contradicting it at trial.  *See* Doc. 118 at 7 (citing *State Farm Mut. Auto. Ins. Co. v. New Horizon, Inc.*, 250 F.R.D. 203, 212 (E.D. Pa. 2008)); Doc. 128 at 4-7.  As the *State Farm* decision explained, however, "[t]his is not quite the case:" "Although the Third Circuit has yet to address the issue, the better rule is that 'the testimony of a Rule 30(b)(6) representative, although admissible against the party that designates the representative, is not a judicial admission absolutely binding on that party.'" 250 F.R.D. at 212 (quoting Charles A. Wright *et al.*, 8A *Federal Practice and Procedure* § 2103 (Supp. 2007)) (further citations omitted).  Rather, "testimony given at a Rule 30(b)(6) deposition is evidence which, like any other deposition testimony, can be contradicted and used for impeachment purposes." *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001) (quoting *Indus. Hard Chrome, Ltd. v. Hetran, Inc.*, 92 F.Supp.2d 786, 791 (N.D. Ill. 2000)); *accord R & B Appliance Parts, Inc. v. Amana Co., L.P.*, 258 F.3d 783, 786 (8th Cir. 2001).

---

[2] Fed. R. Civ. P. 30(b)(6) (Notice or Subpoena Directed to an Organization) provides:

> In its notice or subpoena, a party may name as the deponent a . . . private corporation, . . . and must describe with reasonable particularity the matters for examination.  The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify.  A subpoena must advise a nonparty organization of its duty to make this designation.  The persons designated must testify about information known or reasonably available to the organization.  This paragraph (6) does not preclude a deposition by any other procedure allowed by these rules.

Because Rule 30(b)(6) does not prohibit the introduction of evidence at trial that contradicts or expands on the deposition testimony of a Rule 30(b)(6) witness, the motion is denied.[3]

###   C.   Misappropriation of Trade Secrets

OHL's first claim at trial was that Larry, Ercolani and 721 violated the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. C.S. § 5302 *et seq.*, by misappropriating its customer contact information.  OHL alleges that the employees who left OHL to join 721 in January of 2012 provided Larry with the contact information in the pipeline spreadsheet, which constituted OHL's trade secret.

The PUTSA prohibits the acquisition, disclosure or use of a trade secret by a person who knows or has reason to know that it was acquired through improper means.  *See* 12 Pa. C.S. § 5302.  A "trade secret" is information that "[d]erives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons," and is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  *Id.*; *see also Ozburn-Hessey*, 2014 WL 1364506, at *5-6 (discussing Pennsylvania trade-secret law).  Where "permanent and exclusive relationships are established between customers and salesmen," the "customer lists and customer information which have been compiled by such firms" qualify for trade-secret protection.  *Morgan's Home Equip. Corp. v. Martucci,* 136 A.2d 838, 842 (Pa. 1957).  Customer data is not protected, however, if it is "available through published lists of suppliers and other catalogue and sales publications."  *Id.* at 842 n.2 (citing *Vincent Horwitz Co. v. Cooper*, 41 A.2d 870 (Pa. 1945)).  "[A]n employee's

---

[3] "This does not mean, however, that the party may retract prior testimony with impunity."  *State Farm*, 250 F.R.D. at 212.  Rule 30(b)(6) does obligate a corporate party to designate and prepare its witness to "testify about information known or reasonably available to the organization," Fed. R. Civ. P. 30(b)(6), and if a corporate party fails to do so, it may face some sanction.  *See, e.g.*, *State Farm*, 250 F.R.D. at 212-13 & n.6; Wright *et al.*, 8A *Federal Practice and Procedure* § 2103 (3d ed.).  There has been no motion for sanctions or argument that OHL violated Rule 30(b)(6) in this case.

personal business contacts, although made while in plaintiff's employ, are not plaintiff's trade

secrets." *BIEC Int'l, Inc. v. Global Steel Servs., Ltd.,* 791 F. Supp. 489, 546 (E.D. Pa. 1992)

(citing *SI Handling Sys., Inc. v. Heisley,* 753 F.2d 1244, 1258-59 (3d Cir. 1985)).

      The customer contact information in the 721 pipeline spreadsheet is not OHL's trade

secret.  The identities of relevant contacts at produce import companies, along with their email

addresses and phone numbers, are generally known in the customs brokerage community and are

readily ascertainable by proper means (including trade publications).  The individual contacts are

therefore not trade secrets.  Furthermore, to the extent that the OHL employees developed

"personal business contacts" during their time at OHL, those were not OHL's trade secrets.  *See*

*BIEC,* 791 F. Supp. at 546; *SI Handling Sys.,* 753 F.2d at 1258-59.  The spreadsheet document

itself might qualify as a trade secret, because it is a compilation that took time and effort to

create – but if so, it is 721's trade secret, not OHL's.  *See, e.g.*, *PNC Mortgage v. Superior*

*Mortgage Corp.*, 2012 WL 628000, at *21-24 (E.D. Pa. Feb. 27, 2012) (explaining that customer

contact lists can qualify as trade secrets because of the time entailed in creating them) (quoting

and citing *Morgan's*, 136 A.2d at 842)).

      As I have noted before, OHL's claim actually appears to be that the spreadsheet merely

reproduced a compilation that already existed at OHL – in the collective mind of its employees –

and that this metaphysical compilation was its trade secret.  *See Ozburn-Hessey*, 2014 WL

1364506, at *6.  There is no basis in Pennsylvania law for affording trade-secret protection to a

"compilation" that exists only in the collective consciousness.  *Cf. PNC Mortgage*, 2012 WL

628000, at *21-24 (addressing PUTSA claim based on tangible compilations); *Amerisource-*

*bergen*, 2008 WL 248933, at *25 (same); *BIEC*, 791 F. Supp. at 544 (same); *Morgan's*, 136

A.2d at 842 (same).  The abstract composite of all the contact information in the pipeline spreadsheet was not OHL's trade secret.

Finally, even if the information could somehow constitute OHL's trade secret, there would be no misappropriation in this case because Larry obtained the information in the spreadsheet himself, through proper means.

OHL has failed to show that any defendant in this case violated the PUTSA.

### D.    Unfair Competition

The second claim at trial was that Larry and 721 engaged in unfair competition.  Pursuant to Pennsylvania common law, unfair competition is the "systematic inducing of employe[e]s to leave their present employment and take work with another" in order to "cripple and destroy an integral part" of a business, or "for the purpose of having the employe[e]s commit wrongs, such as disclosing their former employer's trade secrets or enticing away his customers," "rather than to obtain the services of particularly gifted or skilled employees."  *Albee Homes, Inc. v. Caddie Homes, Inc.,* 207 A.2d 768, 771 (Pa. 1965); *see also Reading Radio, Inc. v. Fink et al.,* 833 A.2d 199, 212 (Pa. Super. Ct. 2003).

It was abundantly clear at trial that Larry recruited the former OHL employees in order to obtain the services of particularly skilled and gifted employees, not to cripple OHL or have its former employees commit wrongs.  As in *Albee Homes, Inc.*, "[t]here is no evidence whatsoever of an ulterior motive."  207 A.2d at 771.  OHL's claim is premised on the problems that the lift-out caused for its perishables division, but "the disruptive effect [was] the consequence, not the purpose" of Larry's recruitment.  *Id.*  He did intend to have the employees help solicit OHL clients, among others, but that is no more than legitimate competition in an industry of limited players.  OHL's employees were not constrained by restrictive covenants, did not disclose OHL

trade secrets, and committed no legal wrongdoing in exploiting the knowledge and customer relationships they developed at OHL for the benefit of 721. *See, e.g.*, *SI Handling Sys.,* 753 F.2d at 1259 ("[A] an employer who fears this kind of future competition must protect himself by a preventive contract with his employee . . . .") (quoting and citing *Spring Steels v. Molloy*, 162 A.2d 370, 375 (Pa. 1960)); *Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy*, 203 A.2d 469, 471-73 (Pa. 1964) ("Generally, in the absence of an express contract to the contrary, solicitation of a former employer's customers, on behalf of another in competition with his former employer, will not be enjoined.").

OHL has argued its case as if a coordinated lift-out necessarily constitutes unfair competition.  It does not.  If a competitor recruits important company personnel for their skill, and those individuals are both employed at will and so unhappy that they uniformly leap at the offer, the company they leave behind has no ground for complaint.  OHL neglected its employees' job satisfaction at its own peril.  Larry made an appealing offer to nine people whom he recruited for their talent and expertise, and OHL lost a group of valuable employees whom it had not valued highly enough.  No one induced the employees to leave OHL and join 721 for any impermissible purpose.

721 and Larry Antonucci did not engage in unfair competition.

### E.    Conspiracy to Engage in Unfair Competition

OHL's allegation with respect to this claim, as clarified by its Second Amended Complaint, was that the defendants conspired to sabotage OHL's perishables division by lifting out key employees at the height of the winter fruit season.

Given the lack of an underlying tort, the conspiracy claim is barred as matter of law. *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 407 (3d Cir. 2000).  Even if that

were not so, the claim would fail on the facts.  "To prove a civil conspiracy, it must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means," and that they acted with "malice, *i.e.*, an intent to injure."  *Thompson Coal Co. v. Pike Coal Co.,* 412 A.2d 466, 472 (Pa. 1979).[4]  There is no evidence whatsoever that any defendant conspired with Larry to sabotage OHL's perishables division.  On the contrary:  The evidence demonstrates unequivocally that (a) no one else knew whom Larry intended to hire until the offers were made; (b) Lynette argued for different timing; and (c) Lynette and J&K had clear, legitimate business reasons for entering into partnership with 721.  Larry and Lynette certainly did agree to launch a new business to compete with OHL, hoped to win business from OHL by offering superior service, and were happy at their success.  That does not constitute unlawful conduct.  There was no agreement among any defendants to take any unlawful action.

## F.    Breach of Contract

The last claim at trial was OHL's allegation that Ercolani breached the prohibition in his non-solicitation covenant against "directly or indirectly" employing any OHL employee when he became a part owner of 721.  Ex. 30 § 1.  OHL also argues that Ercolani breached his covenant by assisting in the hiring of the former OHL employees.  To prove a breach of contract a plaintiff

---

[4] Several judges in this district, including myself, have stated that Pennsylvania law requires a plaintiff to show that the "*sole* purpose of the conspiracy was to injure the plaintiffs."  *Ozburn-Hessey*, 2014 WL 1364506, at *11 (quoting and citing *Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 419 (E.D. Pa. 2009)); *Spitzer v. Abdelhak*, 1999 WL 12044352, at *9 (E.D. Pa.  Dec. 15, 1999); *Morilus v. Countrywide Home Loans, Inc.*, 651 F.Supp.2d 292, 313 (E.D. Pa. 2008); *American Independent Ins. Co. v. Lederman*, 2000 WL 1209371, at *20 (E.D. Pa. 2000).  This may not be true.  All of the above-cited cases rely, directly or indirectly, on the Pennsylvania Supreme Court's decision in *Thompson* – which actually requires a plaintiff to prove an "intent to injure" that lacks "justification."  412 A.2d at 472.  Acting "solely" to advance one's own "legitimate business interests" constitutes justification.  On the other hand, acting "merely" to injure the plaintiff is never justified.  *Id.*  But *Thompson* does not address whether defendants may be liable if they act with mixed motives.  The point is irrelevant in this case, because OHL has not shown that there was any agreement to lift out OHL's perishables team, let alone with any intent to injure OHL.

must prove "the existence of a contract (including its essential terms), a breach of duty imposed by the contract and resultant damages." *Gen. State Auth. v. Coleman Cable & Wire Co.,* 365 A.2d 1347, 1349 (Pa. Cmwlth. Ct. 1976).

Under Pennsylvania law, a restrictive covenant must be supported by adequate consideration to constitute a valid contract. *See generally Pulse Technologies, Inc. v. Notaro*, 67 A.3d 778 (Pa. 2013); *Socko v. Mid-Atl. Sys. of CPA, Inc.*, --- A.3d ----, 2014 WL 1898584, at *2-7 (Pa. Super. Ct. May 13, 2014) ("review[ing] the history of the enforcement of restrictive covenants in Pennsylvania to determine the precise nature of the consideration required to support them"). If a restrictive covenant is included in an initial employment contract, the employment itself is sufficient consideration. *See, e.g.*, *Pulse Technologies*, 67 A.3d at 782; *George W. Kistler, Inc. v. O'Brien*, 347 A.2d 311, 316 (Pa. 1975). But if the restrictive covenant "is agreed upon at some later time it must be supported by new consideration." *Kistler*, 347 A.2d at 316. "[C]ontinuation of the employment relationship" is not sufficient consideration to support a restrictive covenant, even if the relationship had previously been terminable at the will of either party. *Id.* Rather, the new consideration must include "a change in the conditions of employment." *Maint. Specialties, Inc. v. Gottus*, 314 A.2d 279, 281 (Pa. 1974).

The parties in this case dispute whether Ercolani's restrictive covenant was included in his employment contract for the position of import supervisor or was added as "an after-thought to impose additional restrictions on the unsuspecting employee" after a contract was already formed. *Beneficial Fin. Co. of Lebanon v. Becker*, 222 A.2d 873, 876 (Pa. 1966). The answer turns on whether Ercolani's acceptance of the offer letter created a valid employment contract. *See Pulse Technologies*, 67 A.3d at 782. In *Pulse Technologies*, the Pennsylvania Supreme Court held that the defendant's assent to an offer letter did not constitute an employment contract

because the letter "specifically stated Notaro had to execute the [separate] employment contract as a condition of employment." *Id*. "[T]he employment agreement, not the offer letter, contained the definitive terms and conditions of employment." *Id*. The letter, therefore, "was not a binding employment contract." *Id*.

Here, in contrast, OHL's offer letter made no reference to conditions of employment other than those it contained. Pursuant to the language drafted by OHL itself, Ercolani accepted "the terms and conditions outlined in this letter," none of which included a restrictive covenant or the execution of a separate agreement. Ex. 78. Furthermore, the limited caveat that "changes may be made to the compensation and benefits packages at management's discretion" implied that no other changes to the terms and conditions could or would be made. *Id*. Unlike in *Pulse Technologies*, an employment contract was formed when Ercolani signed the offer letter, and the restrictive covenant was added after the contract existed. The covenant therefore required new consideration to be valid. Because it was not supported by new consideration, it is void, and Ercolani is entitled to judgment in his favor on this claim.[5]

### G.   Counterclaim for Attorneys' Fees pursuant to the PUTSA

Finally, the defendants have pled a counterclaim against OHL, seeking attorneys' fees pursuant to the PUTSA, 12 Pa. C.S. § 5305, on the basis that OHL's misappropriation claim was made in bad faith. Another district court in this circuit recently concluded that § 5305 does not state an independent cause of action, but rather authorizes a prevailing party to seek attorneys'

---

[5] I also note that, even if OHL could show that Ercolani breached a contractual duty, it would have to show "resultant damages" – that is, harm flowing from Ercolani's acquisition of an ownership interest in 721 in May of 2012 – to prevail on its claim. *Coleman,* 365 A.2d at 1349. This Court's order bifurcating trial prevented OHL from presenting damages evidence during the liability phase of trial. *See* Doc. 127. Notwithstanding that fact, it appears highly unlikely that OHL could present any evidence demonstrating a causal relationship between Ercolani's acquisition of an ownership interest and OHL's lost business. *See* Tr. 3 at 323-24. With respect to the second theory of breach – that Ercolani assisted in the hiring of OHL employees – the evidence does not support the claim.

fees by appropriate motion.  *See Peek v. Whittaker*, 2014 WL 2154965, at *8 (W.D. Pa. May 22, 2014) ("Plaintiffs have not pointed the Court to any case law indicating that Section 5305 creates a standalone cause of action . . . , and the Court has not located any such cases in its own research.  Instead, courts have routinely considered Section 5305 claims on a motion following either summary judgment or trial . . . .").  The defendants have implicitly acknowledged as much by noting that they intend to file a post-trial motion for attorneys' fees on the basis of § 5305.  *See* ECF 118 at 8.  Because § 5305 does not provide an independent cause of action, the defendants' counterclaim will be dismissed for failure to state a cognizable claim.  *See* Fed. R. Civ. P. 12(b)(6); *Peek*, 2014 WL 2154965, at *8.  The dismissal is without prejudice to defendants' right to move for attorneys' fees pursuant to Fed. R. Civ. P. 54.

### III.  CONCLUSION

For the reasons given, judgment will be entered against Ozburn-Hessey Logistics, LLC and in favor of the defendants on all claims against them.  The defendants' counterclaim will be dismissed without prejudice.

An appropriate order and order of judgment follow.